(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CBOCS WEST, INC. *v.* HUMPHRIES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 06–1431.   Argued February 20, 2008—Decided May 27, 2008

Claiming that petitioner CBOCS West, Inc., dismissed him because he is black and because he complained to managers that a black co-employee was also dismissed for race-based reasons, respondent Humphries filed suit charging that CBOCS' actions violated both Title VII of the Civil Rights Act of 1964 and 42 U. S. C. §1981, the latter of which gives "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  The District Court dismissed the Title VII claims for failure to timely pay filing fees and granted CBOCS summary judgment on the §1981 claims. The Seventh Circuit affirmed on the direct discrimination claim, but remanded for a trial on Humphries' §1981 retaliation claim, rejecting CBOCS' argument that §1981 did not encompass such a claim.

*Held:* Section 1981 encompasses retaliation claims.  Pp. 2–14.

   (a) Because this conclusion rests in significant part upon *stare decisis* principles*,* the Court examines the pertinent interpretive history.  (1) In 1969, *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 237, as later interpreted and relied on by *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 176, recognized that retaliation actions are encompassed by 42 U. S. C. §1982, which provides that "[a]ll citizens . . . shall have the same right, . . . , as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property."  (2) This Court has long interpreted §§1981 and 1982 alike because they were enacted together, have common language, and serve the same purpose of providing black citizens the same legal rights as enjoyed by other citizens.  See, *e.g., Runyon* v. *McCrary*, 427 U. S. 160, 183, 197, 190.  (3) In 1989, *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 177, without mention of retaliation, narrowed §1981 by excluding from its scope conduct occurring after formation

of the employment contract, where retaliation would most likely be found.  Subsequently, Congress enacted the Civil Rights Act of 1991, which was designed to supersede *Patterson,* see *Jones* v. *R. R. Don-nelley & Sons Co.*, 541 U. S. 369, 383, by explicitly defining §1981's scope to include post-contract-formation conduct, §1981(b).  (4) Since 1991, the Federal Courts of Appeals have uniformly interpreted §1981 as encompassing retaliation actions.  *Sullivan,* as interpreted by *Jackson,* as well as a long line of related cases where the Court construes §§1981 and 1982 similarly, lead to the conclusion that the view that §1981 encompasses retaliation claims is well embedded in the law.  *Stare decisis* considerations strongly support the Court's adherence to  that view.  Such considerations impose a considerable burden on those who would seek a different interpretation that would necessarily unsettle many Court precedents.  Pp. 2–8.

  (b) CBOCS' several arguments, taken separately or together, can-not justify a departure from this well-embedded interpretation of §1981.  First, while CBOCS is correct that §1981's plain text does not expressly refer to retaliation, that alone is not sufficient to carry the day, given this Court's long recognition that §1982 provides protec-tion against retaliation; *Jackson*'s recent holding that Title IX of the Education Amendments of 1972 includes an antiretaliation remedy, despite Title IX's failure to use the word "retaliation," 544 U. S., at 173–174, 176; and *Sullivan*'s refusal to embrace a similar argument, see 396 U. S., at 241.  Second, contrary to CBOCS' assertion, Con-gress' failure to include an *explicit* antiretaliation provision in its 1991 amendment of §1981 does not demonstrate an intention not to cover retaliation, but is more plausibly explained by the fact that, given *Sullivan* and the new statutory language nullifying *Patterson,* there was no need to include explicit retaliation language.  Third, the argument that applying §1981 to employment-related retaliation ac-tions would create an overlap with Title VII, allegedly allowing a re-taliation plaintiff to circumvent Title VII's detailed administrative and procedural mechanisms and thereby undermine their effective-ness, proves too much.  Precisely the same kind of Title VII/§1981 "overlap" and potential circumvention exists in respect to employ-ment-related direct discrimination, yet Congress explicitly and inten-tionally created that overlap, *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 48–49.  Fourth, contrary to its arguments, CBOCS cannot find support in *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53, 63, and *Domino's Pizza, Inc.* v. *McDonald*, 546 U. S. 470.  While *Bur-lington* distinguished discrimination based on status (*e.g.,* as women or black persons) from discrimination based on conduct (*e.g.,* whistle-blowing that leads to retaliation), it did not suggest that Congress must separate the two in all events.  Moreover, while *Domino's Pizza*

Syllabus

and other more recent cases may place greater emphasis on statutory language than did *Sullivan,* any arguable change in interpretive approach would not justify reexamination of well-established prior law under s*tare decisis* principles.  Pp. 9–14.

474 F. 3d 387, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–1431

———————

## CBOCS WEST, INC., PETITIONER *v.* HEDRICK G. HUMPHRIES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 27, 2008]

JUSTICE BREYER delivered the opinion of the Court.

A longstanding civil rights law, first enacted just after the Civil War, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Rev. Stat. §1977, 42 U. S. C. §1981(a). The basic question before us is whether the provision encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related "right." We conclude that it does.

I

The case before us arises out of a claim by respondent, Hedrick G. Humphries, a former assistant manager of a Cracker Barrel restaurant, that CBOCS West, Inc. (Cracker Barrel's owner) dismissed him (1) because of racial bias (Humphries is a black man) and (2) because he had complained to managers that a fellow assistant manager had dismissed another black employee, Venus Green, for race-based reasons. Humphries timely filed a charge with the Equal Employment Opportunity Commission

(EEOC), pursuant to 42 U. S. C. §2000e–5, and received a "right to sue" letter. He then filed a complaint in Federal District Court charging that CBOCS' actions violated both Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §2000e *et seq*., and the older "equal contract rights" provision here at issue, §1981. The District Court dismissed Humphries' Title VII claims for failure to pay necessary filing fees on a timely basis. It then granted CBOCS' motion for summary judgment on Humphries' two §1981 claims. Humphries appealed.

The U. S. Court of Appeals for the Seventh Circuit ruled against Humphries and upheld the District Court's grant of summary judgment in respect to his direct discrimination claim. But it ruled in Humphries' favor and remanded for a trial in respect to his §1981 retaliation claim. In doing so, the Court of Appeals rejected CBOCS' argument that §1981 did not encompass a claim of retaliation. 474 F. 3d 387 (2007). CBOCS sought certiorari, asking us to consider this last-mentioned legal question. And we agreed to do so. See 551 U. S.___ (2007).

## II

The question before us is whether §1981 encompasses retaliation claims. We conclude that it does. And because our conclusion rests in significant part upon principles of *stare decisis,* we begin by examining the pertinent interpretive history.

## A

The Court first considered a comparable question in 1969, in *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229. The case arose under 42 U. S. C. §1982, a statutory provision that Congress enacted just after the Civil War, along with §1981, to protect the rights of black citizens. The provision was similar to §1981 except that it focused, not upon rights to make and to enforce contracts, but

rights related to the ownership of property. The statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." §1982.

Paul E. Sullivan, a white man, had rented his house to T. R. Freeman, Jr., a black man. He had also assigned Freeman a membership share in a corporation, which permitted the owner to use a private park that the corporation controlled. Because of Freeman's race, the corporation, Little Hunting Park, Inc., refused to approve the share assignment. And, when Sullivan protested, the association expelled Sullivan and took away his membership shares.

Sullivan sued Little Hunting Park, claiming that its actions violated §1982. The Court upheld Sullivan's claim. It found that the corporation's refusal "to approve the assignment of the membership share . . . was clearly an interference with Freeman's [the black lessee's] right to 'lease.'" 396 U. S., at 237. It added that Sullivan, the white lessor, "has standing to maintain this action," *ibid.*, because, as the Court had previously said, "the white owner is at times 'the only effective adversary' of the unlawful restrictive covenant." *Ibid.* (quoting *Barrows* v. *Jackson*, 346 U. S. 249 (1953)). The Court noted that to permit the corporation to punish Sullivan "for trying to vindicate the rights of minorities protected by §1982" would give "impetus to the perpetuation of racial restrictions on property." 396 U. S., at 237. And this Court has made clear that *Sullivan* stands for the proposition that §1982 encompasses retaliation claims. See *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 176 (2005) ("[I]n *Sullivan* we interpreted a general prohibition on racial discrimination [in §1982] to cover retaliation against those who advocate the rights of groups protected by that prohibition").

While the *Sullivan* decision interpreted §1982, our precedents have long construed §§1981 and 1982 similarly. In *Runyon* v. *McCrary*, 427 U. S. 160, 173 (1976), the Court considered whether §1981 prohibits private acts of discrimination. Citing *Sullivan*, along with *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968) and *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431 (1973), the Court reasoned that this case law "necessarily requires the conclusion that §1981, like §1982, reaches private conduct." 427 U. S., at 173. See also *id.*, at 187 (Powell, J., concurring) ("Although *[Sullivan* and *Jones]* involved §1982, rather than §1981, I agree that their considered holdings with respect to the purpose and meaning of §1982 necessarily apply to both statutes in view of their common derivation"); *id.*, at 190 (STEVENS, J., concurring) ("[I]t would be most incongruous to give those two sections [§§1981 and 1982] a fundamentally different construction"). See also *Shaare Tefila Congregation* v. *Cobb*, 481 U. S. 615, 617–618 (1987) (applying to §1982 the discussion and holding of *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604, 609–613 (1987), a case interpreting §1981).

As indicated in *Runyon*, the Court has construed §§1981 and 1982 alike because it has recognized the sister statutes' common language, origin, and purposes. Like §1981, §1982 traces its origin to §1 of the Civil Rights Act of 1866, 14 Stat. 27. See *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 383–384 (1982) (noting shared historical roots of the two provisions); *Tillman, supra,* at 439–440 (same). Like §1981, §1982 represents an immediately post-Civil War legislative effort to guarantee the then newly freed slaves the same legal rights that other citizens enjoy. See *General Building Contractors Assn., supra,* at 388 (noting strong purposive connection between the two provisions). Like §1981, §1982 uses broad language that says "[a]ll citizens of the United

States shall have the same right, in every State and Territory, as is enjoyed by white citizens . . . ."　Compare §1981's language set forth above, *supra*, at 1.　See *Jones, supra*, at 441, n. 78 (noting the close parallel language of the two provisions).　Indeed, §1982 differs from §1981 only in that it refers, not to the "right . . . to make and enforce contracts," 42 U. S. C. §1981(a), but to the "right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property," §1982.

In light of these precedents, it is not surprising that following *Sullivan*, federal appeals courts concluded, on the basis of *Sullivan* or its reasoning, that §1981 encompassed retaliation claims.　See, *e.g.*, *Choudhury* v. *Polytechnic Inst. of N. Y.,* 735 F. 2d 38, 42–43 (CA2 1984); *Goff* v. *Continental Oil Co.*, 678 F. 2d 593, 598–599 (CA5 1982), overruled, *Carter* v. *South Central Bell*, 912 F. 2d 832 (CA5 1990); *Winston* v. *Lear-Siegler, Inc.*, 558 F. 2d 1266, 1270 (CA6 1977).

### B

In 1989, 20 years after *Sullivan,* this Court in *Patterson* v. *McLean Credit Union*, 491 U. S. 164, significantly limited the scope of §1981.　The Court focused upon §1981's words "to make and enforce contracts" and interpreted the phrase narrowly.　It wrote that the statutory phrase did not apply to "conduct by the employer *after the contract relation has been established*, including breach of the terms of the contract or imposition of discriminatory working conditions."　*Id.,* at 177 (emphasis added).　The Court added that the word "enforce" does not apply to post-contract-formation conduct unless the discrimination at issue "*infects the legal process* in ways that prevent one from enforcing contract rights."　*Ibid*. (emphasis added).　Thus §1981 did not encompass the claim of a black employee who charged that her employer had violated her employment contract by harassing her and failing to

promote her, all because of her race. *Ibid.*

Since victims of an employer's retaliation will often have opposed discriminatory conduct taking place *after* the formation of the employment contract, *Patterson'*s holding, for a brief time, seems in practice to have foreclosed retaliation claims. With one exception, we have found no federal court of appeals decision between the time we decided *Patterson* and 1991 that permitted a §1981 retaliation claim to proceed. See, *e.g.*, *Walker* v. *South Central Bell Tel. Co.*, 904 F. 2d 275, 276 (CA5 1990) *(per curiam); Overby* v. *Chevron USA, Inc.*, 884 F. 2d 470, 473 (CA9 1989); *Sherman* v. *Burke Contracting, Inc.*, 891 F. 2d 1527, 1534–1535 (CA11 1990) *(per curiam).* See also *Malhotra* v. *Cotter & Co.*, 885 F. 2d 1305, 1312–1314 (CA7 1989) (questioning without deciding the viability of retaliation claims under §1981 after *Patterson*). But see *Hicks* v. *Brown Group, Inc.*, 902 F. 2d 630, 635–638 (CA8 1990) (allowing a claim for discriminatory discharge to proceed under §1981), vacated and remanded, 499 U. S. 914 (1991) (ordering reconsideration in light of what became the Eighth Circuit's en banc opinion in *Taggart* v. *Jefferson Cty. Child Support Enforcement Unit*, 935 F. 2d 947 (1991), which held that racially discriminatory discharge claims under §1981 are barred).

In 1991, however, Congress weighed in on the matter. Congress passed the Civil Rights Act of 1991, §101, 105 Stat. 1071, with the design to supersede *Patterson*. *Jones* v. *R. R. Donnelley & Sons Co.*, 541 U. S. 369, 383 (2004). Insofar as is relevant here, the new law changed 42 U. S. C. §1981 by reenacting the former provision, designating it as §1981(a), and adding a new subsection, (b), which, says:

> "'Make and enforce contracts' defined
> "For purposes of this section, the term 'make and enforce contracts' includes the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

An accompanying Senate Report pointed out that the amendment superseded *Patterson* by adding a new subsection (b) that would "reaffirm that the right 'to make and enforce contracts' includes the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." S. Rep. No. 101–315, p. 6 (1990). Among other things, it would "ensure that Americans may not be harassed, *fired* or otherwise discriminated against in contracts because of their race." *Ibid.* (emphasis added). An accompanying House Report said that in "cutting back the scope of the rights to 'make' and 'enforce' contracts[,] *Patterson* . . . has been interpreted to eliminate retaliation claims that the courts had previously recognized under section 1981." H. R. Rep. No. 102–40, pt. 1, pp. 92–93, n. 92 (1991). It added that the protections that subsection (b) provided, in "the context of employment discrimination . . . would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, *retaliation*, and hiring." *Id.*, at 92 (emphasis added). It also said that the new law "would restore rights to sue for such retaliatory conduct." *Id.*, at 93, n. 92.

After enactment of the new law, the Federal Courts of Appeals again reached a broad consensus that §1981, as amended, encompasses retaliation claims. See, *e.g.*, *Hawkins* v. *1115 Legal Serv. Care*, 163 F. 3d 684, 693 (CA2 1998); *Aleman* v. *Chugach Support Servs., Inc.*, 485 F. 3d 206, 213–214 (CA4 2007); *Foley* v. *University of Houston System*, 355 F. 3d 333, 338–339 (CA5 2003); *Johnson* v. *University of Cincinnati*, 215 F. 3d 561, 575–576 (CA6 2000); 474 F. 3d, at 403 (case below); *Manatt* v. *Bank of America, NA*, 339 F. 3d 792, 800–801, and n. 11 (CA9 2003); *Andrews* v. *Lakeshore Rehabilitation Hospital*, 140

F. 3d 1405, 1411–1413 (CA11 1998).

The upshot is this: (1) in 1969, *Sullivan*, as interpreted by *Jackson*, recognized that §1982 encompasses a retaliation action; (2) this Court has long interpreted §§1981 and 1982 alike; (3) in 1989, *Patterson*, without mention of retaliation, narrowed §1981 by excluding from its scope conduct, namely post-contract-formation conduct, where retaliation would most likely be found; but in 1991, Congress enacted legislation that superseded *Patterson* and explicitly defined the scope of §1981 to include post-contract-formation conduct; and (4) since 1991, the lower courts have uniformly interpreted §1981 as encompassing retaliation actions.

### C

*Sullivan*, as interpreted and relied upon by *Jackson*, as well as the long line of related cases where we construe §§1981 and 1982 similarly, lead us to conclude that the view that §1981 encompasses retaliation claims is indeed well embedded in the law. That being so, considerations of *stare decisis* strongly support our adherence to that view. And those considerations impose a considerable burden upon those who would seek a different interpretation that would necessarily unsettle many Court precedents. See, *e.g.*, *Welch* v. *Texas Dept. of Highways and Public Transp.*, 483 U. S. 468, 494–495 (1987) (plurality opinion) (describing importance of *stare decisis*); *Patterson*, 491 U. S., at 172 (considerations of *stare decisis* "have special force in the area of statutory interpretation"); *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. ___, ___ (2008) (slip op., at 8–9) (same).

### III

In our view, CBOCS' several arguments, taken separately or together, cannot justify a departure from what we have just described as the well-embedded interpreta-

tion of §1981. First, CBOCS points to the plain text of §1981—a text that says that "*[a]ll persons* . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by *white citizens.*" 42 U. S. C. §1981(a) (emphasis added). CBOCS adds that, insofar as Humphries complains of retaliation, he is complaining of a retaliatory action that the employer would have taken against him whether he was black or white, and there is no way to construe this text to cover that kind of deprivation. Thus the text's language, CBOCS concludes, simply "does not provide for a cause of action based on retaliation." Brief for Petitioner 8.

We agree with CBOCS that the statute's language does not expressly refer to the claim of an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his §1981 rights. But that fact alone is not sufficient to carry the day. After all, this Court has long held that the statutory text of §1981's sister statute, §1982, provides protection from retaliation for reasons related to the *enforcement* of the express statutory right. See *supra*, at 3.

Moreover, the Court has recently read another broadly worded civil rights statute, namely, Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. §1681 *et seq.*, as including an antiretaliation remedy. In 2005 in *Jackson*, the Court considered whether statutory language prohibiting "discrimination [on the basis of sex] under any education program or activity receiving Federal financial assistance," §1681(a), encompassed claims of retaliation for complaints about sex discrimination. 544 U. S., at 173–174. Despite the fact that Title IX does not use the word "retaliation," the Court held in *Jackson* that the statute's language encompassed such a claim, in part because: (1) "Congress enacted Title IX just three years after *Sullivan* was decided"; (2) it is

"'realistic to presume that Congress was thoroughly familiar'" with *Sullivan;* and (3) Congress consequently "'expected its enactment'" of Title IX "'to be interpreted in conformity with'" *Sullivan*. *Jackson, supra*, at 176. The Court in *Jackson* explicitly rejected the arguments the dissent advances here—that *Sullivan* was merely a standing case, see *post*, at 8–11 (opinion of THOMAS, J.). Compare *Jackson*, 544 U. S., at 176, n. 1 ("*Sullivan*'s holding was not so limited. It plainly held that the white owner could maintain his *own* private cause of action under §1982 if he could show that he was 'punished for trying to vindicate the rights of minorities'" (emphasis in original)), with *id.*, at 194 (THOMAS, J., dissenting).

Regardless, the linguistic argument that CBOCS makes was apparent at the time the Court decided *Sullivan*. See 396 U. S., at 241 (Harlan, J., dissenting) (noting the construction of §1982 in *Jones*, 392 U. S. 409 was "in no way required by [the statute's] language,"—one of the bases of Justice Harlan's dissent in *Jones*—and further contending that the Court in *Sullivan* had gone "yet beyond" *Jones*). And we believe it is too late in the day in effect to overturn the holding in that case (nor does CBOCS ask us to do so) on the basis of a linguistic argument that was apparent, and which the Court did not embrace at that time.

Second, CBOCS argues that Congress, in 1991 when it reenacted §1981 with amendments, intended the reenacted statute *not* to cover retaliation. CBOCS rests this conclusion primarily upon the fact that Congress *did not* include an *explicit* antiretaliation provision or the word "retaliation" in the new statutory language—although Congress has included explicit antiretaliation language in other civil rights statutes. See, *e.g.,* National Labor Relations Act, 29 U. S. C. §158(a)(4); Fair Labor Standards Act of 1938, 29 U. S. C. §215(a)(3); Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–3(a); Age Discrimination in Employment Act of 1967, 29 U. S. C. §623(d); Ameri-

cans with Disabilities Act of 1990, 42 U. S. C. §§12203(a)–(b); Family and Medical Leave Act of 1993, 29 U. S. C. §2615.

We believe, however, that the circumstances to which CBOCS points find a far more plausible explanation in the fact that, given *Sullivan* and the new statutory language nullifying *Patterson,* there was no need for Congress to include explicit language about retaliation. After all, the 1991 amendments themselves make clear that Congress intended to supersede the result in *Patterson* and embrace pre-*Patterson* law. And pre-*Patterson* law included *Sullivan.* See Part II, *supra.* Nothing in the statute's text or in the surrounding circumstances suggests any congressional effort to supersede *Sullivan* or the interpretation that courts have subsequently given that case. To the contrary, the amendments' history indicates that Congress intended to restore that interpretation. See, *e.g.*, H. R. Rep. No. 102–40, at 92 (noting that §1981(b) in the "context of employment discrimination . . . would include . . . claims of . . . retaliation").

Third, CBOCS points out that §1981, if applied to employment-related retaliation actions, would overlap with Title VII. It adds that Title VII requires that those who invoke its remedial powers satisfy certain procedural and administrative requirements that §1981 does not contain. See, *e.g.*, 42 U. S. C. §2000e–5(e)(1) (charge of discrimination must be brought before EEOC within 180 days of the discriminatory act); §2000e–5(f)(1) (suit must be filed within 90 days of obtaining an EEOC right-to-sue letter). And CBOCS says that permitting a §1981 retaliation action would allow a retaliation plaintiff to circumvent Title VII's "specific administrative and procedural mechanisms," thereby undermining their effectiveness. Brief for Petitioner 25.

This argument, however, proves too much. Precisely the same kind of Title VII/§1981 "overlap" and potential cir-

cumvention exists in respect to employment-related direct discrimination. Yet Congress explicitly created the overlap in respect to direct employment discrimination. Nor is it obvious how we can interpret §1981 to avoid *employment*-related overlap without eviscerating §1981 in respect to *non*-employment contracts where no such overlap exists.

Regardless, we have previously acknowledged a "necessary overlap" between Title VII and §1981. *Patterson*, 491 U. S., at 181. We have added that the "remedies available under Title VII and under §1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 461 (1975). We have pointed out that Title VII provides important administrative remedies and other benefits that §1981 lacks. See *id.,* at 457–458 (detailing the benefits of Title VII to those aggrieved by race-based employment discrimination). And we have concluded that "Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination." *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 48–49 (1974). In a word, we have previously held that the "overlap" reflects congressional design. See *ibid.* We have no reason to reach a different conclusion in this case.

Fourth, CBOCS says it finds support for its position in two of our recent cases, *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53 (2006), and *Domino's Pizza, Inc.* v. *McDonald*, 546 U. S. 470 (2006). In *Burlington*, a Title VII case, we distinguished between discrimination that harms individuals because of "who they are, *i.e.*, their status," for example, as women or as black persons, and discrimination that harms "individuals based on what they do, *i.e.*, their conduct," for example, whistle-blowing that leads to retaliation. 548 U. S., at 63. CBOCS says that we should draw a similar distinction here and

conclude that §1981 only encompasses status-based discrimination. In *Burlington*, however, we used the status/conduct distinction to help explain why Congress might have wanted its explicit Title VII antiretaliation provision to sweep more broadly (*i.e.*, to include conduct *outside* the workplace) than its substantive Title VII (status-based) antidiscrimination provision. *Burlington* did not suggest that Congress must separate the two in all events.

The dissent argues that the distinction made in *Burlington* is meaningful here because it purportedly "underscores the fact that status-based discrimination and conduct-based retaliation are distinct harms that call for tailored legislative treatment." *Post*, at 5. The Court's construction of a general ban on discrimination such as that contained in §1981 to cover retaliation claims, the dissent continues, would somehow render the separate antiretaliation provisions in other statutes "superfluous." *Ibid.* But the Court in *Burlington* did not find that Title VII's antiretaliation provision was redundant; it found that the provision had a broader reach than the statute's substantive provision. And in any case, we have held that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Alexander*, *supra*, at 47. See *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 377 (1979) ("[S]ubstantive rights conferred in the 19th century [civil rights acts] were not withdrawn, *sub silentio*, by the subsequent passage of the modern statutes"). Accordingly, the Court has accepted overlap between a number of civil rights statutes. See *ibid.* (discussing interrelation of fair housing provisions of the Civil Rights Act of 1968 and §1982; between §1981 and Title VII). See also *supra*, at 11–12 (any overlap in reach between §1981 and Title VII, the statute at issue in *Burlington*, is by congressional design).

CBOCS highlights the second case, *Domino's Pizza*, along with *Patterson*, and cites *Cort* v. *Ash*, 422 U. S. 66 (1975) and *Rodriguez* v. *United States*, 480 U. S. 522 (1987) *(per curiam)*, to show that this Court now follows an approach to statutory interpretation that emphasizes text. And that newer approach, CBOCS claims, should lead us to revisit the holding in *Sullivan,* an older case, where the Court placed less weight upon the textual language itself. But even were we to posit for argument's sake that changes in interpretive approach take place from time to time, we could not agree that the existence of such a change would justify reexamination of well-established prior law. Principles of s*tare decisis,* after all, demand respect for precedent whether judicial methods of interpretation change or stay the same. Were that not so, those principles would fail to achieve the legal stability that they seek and upon which the rule of law depends. See, *e.g., John R. Sand & Gravel Co.,* 552 U. S., at ___ (slip op., at 8–9).

## IV

We conclude that considerations of *stare decisis* strongly support our adherence to *Sullivan* and the long line of related cases where we interpret §§1981 and 1982 similarly. CBOCS' arguments do not convince us to the contrary. We consequently hold that 42 U. S. C. §1981 encompasses claims of retaliation. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 06–1431

CBOCS WEST, INC., PETITIONER *v.* HEDRICK G.
HUMPHRIES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[May 27, 2008]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins,
dissenting.

The Court holds that the private right of action it has
implied under Rev. Stat. §1977, 42 U. S. C. §1981, encom-
passes claims of retaliation. Because the Court's holding
has no basis in the text of §1981 and is not justified by
principles of *stare decisis*, I respectfully dissent.

I

It is unexceptional in our case law that "'[s]tatutory
construction must begin with the language employed by
Congress and the assumption that the ordinary meaning
of that language accurately expresses the legislative pur-
pose.'" *Engine Mfrs. Assn.* v. *South Coast Air Quality
Management Dist.*, 541 U. S. 246, 252 (2004) (quoting *Park
'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 194
(1985)). Today, that rule is honored in the breach: The
Court's analysis of the statutory text does not appear until
Part III of its opinion, and then only as a potential reason
to depart from the interpretation the Court has already
concluded, on other grounds, must "carry the day." *Ante*,
at 9. Unlike the Court, I think it best to begin, as we
usually do, with the text of the statute. Section 1981(a)
provides:

"All persons within the jurisdiction of the United

States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Section 1981(a) thus guarantees "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." It is difficult to see where one finds a cause of action for retaliation in this language. On its face, §1981(a) is a straightforward ban on racial discrimination in the making and enforcement of contracts. Not surprisingly, that is how the Court has always construed it. See, *e.g.*, *Domino's Pizza, Inc.* v. *McDonald*, 546 U. S. 470, 476 (2006) ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship"); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 171 (1989) ("[Section] 1981 'prohibits racial discrimination in the making and enforcement of private contracts'" (quoting *Runyon* v. *McCrary*, 427 U. S. 160, 168 (1976))); *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 459 (1975) (Section 1981 "on its face relates primarily to racial discrimination in the making and enforcement of contracts").

Respondent nonetheless contends that "[t]he terms of section 1981 are significantly different, and broader, than a simple prohibition against discrimination." Brief for Respondent 15. It is true that §1981(a), which was enacted shortly after the Civil War, does not use the modern statutory formulation prohibiting "discrimination on the basis of race." But that is the clear import of its terms. Contrary to respondent's contention, nothing in §1981

evinces a "concer[n] with protecting individuals 'based on what they do,'" as opposed to "'prevent[ing] injury to individuals based on who they are.'"  *Ibid.* (quoting *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53, 63 (2006)). Nor does §1981 "affirmatively guarante[e]" freestanding "rights to engage in particular conduct."  Brief for Respondent 16.  Rather, §1981 is an *equal-rights* provision.  See *Georgia* v. *Rachel*, 384 U. S. 780, 791 (1966) ("Congress intended to protect a limited category of rights, specifically defined in terms of racial equality").  The statute assumes that "white citizens" enjoy certain rights and requires that those rights be extended equally to "[a]ll persons," regardless of their race.  That is to say, it prohibits discrimination based on race.[1]

———————

[1] The United States, appearing as *amicus curiae* in support of respondent, contends that §1981 prohibits not only racial discrimination, but also any other kind of "discrimination" that "impair[s]" the rights guaranteed by §1981(a).  Brief for United States 17.  In support of this argument, the United States points to §1981(c), which provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  Thus, the argument goes, retaliation is prohibited because it is discrimination (differential treatment for those who complain) and it impairs the right granted in §1981(a) to be free from racial discrimination in the making and enforcement of contracts (by penalizing assertion of that right).

Although I commend the United States for at least attempting to ground its position in the statutory text, its argument is unconvincing. Section 1981(c) simply codifies the Court's holding in *Runyon* v. *McCrary*, 427 U. S. 160 (1976), that §1981 applies to private, as well as governmental, discrimination.  Nothing in §1981(c) indicates that Congress otherwise intended to expand the scope of §1981.  To the contrary, §1981(c) refers to "[t]he rights protected by this section," *i.e.*, the rights enumerated in §1981(a) to make and enforce contracts on the same terms as white citizens.  Moreover, the word "discrimination" in §1981(c) does not refer to "all discrimination," as the United States would have it.  See Brief for United States as *Amicus Curiae* 16, n. 4. Rather, it refers back to the type of discrimination prohibited by §1981(a), *i.e.*, discrimination based on race.  Thus, §1981 is violated

Retaliation is not discrimination based on race. When an individual is subjected to reprisal because he has complained about racial discrimination, the injury he suffers is not on account of his *race;* rather, it is the result of his *conduct.* The Court recognized this commonsense distinction just two years ago in *Burlington* when it explained that Title VII's antidiscrimination provision "seeks to prevent injury to individuals based on who they are, *i.e.*, their status," whereas its "antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." 548 U. S., at 63. This distinction is sound, and it reflects the fact that a claim of retaliation is both logically and factually distinct from a claim of discrimination—logically because retaliation based on conduct and discrimination based on status are mutually exclusive categories, and factually because a claim of retaliation does not depend on proof that any status-based discrimination actually occurred. Consider, for example, an employer who fires any employee who complains of race discrimination, regardless of the employee's race. Such an employer is undoubtedly guilty of retaliation, but he has not discriminated on the basis of anyone's race. Because the employer treats all employees—black and white—the same, he does not deny any employee "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."[2]

_____

only when racial discrimination impairs the right to make and enforce contracts.

[2] Of course, if an employer had a *different* retaliation policy for blacks and whites—firing black employees who complain of race discrimination but not firing similarly situated white employees—a black employee who was fired for complaining of race discrimination would have a promising §1981 claim. But his claim would not sound in retaliation; rather, it would be a straightforward claim of racial discrimination. In his briefs before this Court, respondent attempts to shoehorn his claim into this category, asserting that petitioner "retaliated against [him] because he was a black worker who exercised his right" to lodge a

The Court apparently believes that the status/conduct distinction is not relevant here because this case, unlike *Burlington*, does not require us to determine whether §1981's supposed prohibition on retaliation "sweep[s] more broadly" than its antidiscrimination prohibition. *Ante*, at 13. That is nonsense. Although, as the Court notes, we used the status/conduct distinction in *Burlington* to explain why Title VII's antiretaliation provision must sweep more broadly than its antidiscrimination provision in order to achieve its purpose, 548 U. S., at 63–64, it does not follow that the distinction between status and conduct is irrelevant here. To the contrary, *Burlington* underscores the fact that status-based discrimination and conduct-based retaliation are distinct harms that call for tailored legislative treatment. That is why Congress, in Title VII and a host of other statutes, has enacted separate provisions prohibiting discrimination and retaliation. See Brief for Petitioner 17–18 (citing statutes); see also *ante*, at 10–11 (same). Construing a general ban on discrimination such as that contained in §1981 to cover retaliation would render these separate antiretaliation provisions superfluous, contrary to the normal rules of statutory interpretation.

Of course, this is not the first time I have made these

grievance under petitioner's open-door policy. Brief for Respondent 27; see also *id.*, at 33 ("[S]ection 1981 forbids an employer from having one dismissal policy for blacks who complain about race discrimination, and another for whites who complain about such discrimination"). But respondent cites no record evidence to support his assertion that petitioner treated him differently than it would have treated a similarly situated white complainant. And while the Court of Appeals found that respondent had established a prima facie case of retaliation, 474 F. 3d 387, 406–407 (CA7 2007), it did not identify any evidence that would permit a jury to conclude that the alleged retaliation was race based. Indeed, the Court of Appeals held that respondent had "waived . . . his discrimination claim by devoting only a skeletal argument [to it] in response to [petitioner's] motion for summary judgment." *Id.*, at 407.

points.  Three Terms ago in *Jackson* v. *Birmingham Bd. of
Ed.*, 544 U. S. 167 (2005), the Court held that Title IX of
the Education Amendments of 1972, 20 U. S. C. §1681 *et
seq.*, which prohibits recipients of federal education fund-
ing from discriminating "on the basis of sex," §1681(a),
affords an implied cause of action for retaliation against
those who complain of sex discrimination.  In so doing, the
Court disregarded the fundamental distinction between
status-based discrimination and conduct-based retaliation,
asserting that retaliation against those who complain of
sex discrimination "is discrimination 'on the basis of sex'
because it is an intentional response to the nature of the
complaint: an allegation of sex discrimination."  544 U. S.,
at 174.  But as I explained in my dissenting opinion in
*Jackson*, "the sex-based topic of the complaint cannot
overcome the fact that the retaliation is not based on
anyone's sex, much less the complainer's sex." *Id.*, at 188.

Likewise here, the race-based topic of the complaint
cannot overcome the fact that the retaliation is not based
on anyone's race.  To hold otherwise would be to ignore the
fact that "protection from retaliation is separate from
direct protection of the primary right [against discrimina-
tion] and serves as a prophylactic measure to guard the
primary right." *Id.*, at 189; see also *Burlington*, *supra*, at
63 (explaining that Title VII's "antidiscrimination provi-
sion seeks a workplace where individuals are not dis-
criminated against because of their racial, ethnic, reli-
gious, or gender-based status," whereas its "antiretaliation
provision seeks to secure that primary objective by pre-
venting an employer from interfering (through retaliation)
with an employee's efforts to secure or advance enforce-
ment of the Act's basic guarantees").  In other words, "[t]o
describe retaliation as discrimination on the basis of [race]
is to conflate the enforcement mechanism with the right
itself, something for which the statute's text provides no
warrant." *Jackson*, *supra*, at 189 (THOMAS, J., dissenting).

Notably, the Court does not repeat *Jackson*'s textual analysis in this case, perhaps because no amount of repetition could make it any more plausible today than it was three years ago. Instead, the Court acknowledges that "the statute's language does not expressly refer to the claim of an individual (black or white) who suffers retaliation." *Ante*, at 9. The Court concludes, however, that the statute's failure expressly to provide a cause of action for retaliation "is not sufficient to carry the day," *ibid.*, despite our usual rule that "affirmative evidence of congressional intent must be provided for an implied remedy . . . for without such intent the essential predicate for implication of a private remedy simply does not exist," *Alexander* v. *Sandoval*, 532 U. S. 275, 293, n. 8 (2001) (internal quotation marks and emphasis deleted); see also *id.*, at 286–287 (emphasizing that, absent evidence of Congress' intent to create a cause of action, the "cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute").

Section 1981's silence regarding retaliation is not dispositive, the Court says, because "it is too late in the day" to resort to "a linguistic argument" that was supposedly rejected in *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969). *Ante*, at 10. As I explain below, the Court's reliance on *Sullivan* is entirely misplaced. But it also bears emphasis that the Court does not even purport to identify any basis in the statutory text for the "well-embedded interpretation of §1981," *ante,* at 8–9, it adopts for the first time today. Unlike the Court, I find the statute's text dispositive. Because §1981 by its terms prohibits only discrimination based on race, and because retaliation is not discrimination based on race, §1981 does not provide an implied cause of action for retaliation.

## II

Unable to justify its holding as a matter of statutory interpretation, the Court today retreats behind the figleaf of ersatz *stare decisis.* The Court's invocation of *stare decisis* appears to rest on three considerations: (1) *Sullivan*'s purported recognition of a cause of action for retaliation under §1982; (2) *Jackson*'s (re)interpretation of *Sullivan;* and (3) the Courts of Appeals' view that §1981 provides a cause of action for retaliation. None of these considerations, separately or together, justifies implying a cause of action that Congress did not include in the statute. And none can conceal the irony in the Court's novel use of *stare decisis* to decide a question of first impression.

I turn first to *Sullivan,* as it bears most of the weight in the Court's analysis. As I explained in my dissent in *Jackson, Sullivan* did not "hol[d] that a general prohibition against discrimination permitted a claim of retaliation," but rather "that a white lessor had standing to assert the right of a black lessee to be free from racial discrimination." 544 U. S., at 194. Thus, "[t]o make out his third-party claim on behalf of the black lessee, the white lessor would necessarily be required to demonstrate that the defendant had discriminated against the black lessee on the basis of race." *Ibid.* Here, by contrast, respondent "need not show that the [race] discrimination forming the basis of his complaints actually occurred." *Ibid.* Accordingly, as it did in *Jackson,* the Court "creates an entirely new cause of action for a secondary rights holder, beyond the claim of the original rights holder, and well beyond *Sullivan.*" *Id.,* at 194–195.

Having reexamined *Sullivan,* I remain convinced that it was a third-party standing case. Sullivan did not argue that his expulsion from the corporation—as opposed to the corporation's refusal to approve the assignment—violated §1982. Instead, he argued that his expulsion was "contrary to public policy" because it was the "direct result of

his having dealt with Freeman, as the statute requires, on a non-discriminatory basis." Brief for Petitioners in *Sullivan* v. *Little Hunting Park, Inc.*, O. T. 1969, No. 33, p. 32. Sullivan further contended not that his own rights under §1982 had been violated, but that he "ha[d] standing to rely on the rights of the Negro, Freeman," since he was best situated to vindicate those rights.[3] *Id.*, at 33; see also Pet. for Cert. in *Sullivan* v. *Little Hunting Park, Inc.*, O. T. 1969, No. 33, p. 17, n. 13 ("Although the statute declares the rights of Negroes not to be discriminated against, Sullivan, a Caucasian, has standing to rely on the invasion of the rights of others, since he is the only effective adversary capable of vindicating them in litigation arising from his expulsion" (internal quotation marks omitted)). Similarly, the United States, appearing as *amicus curiae* in support of Sullivan, argued that because "the private action involved in refusing to honor the assignment was itself illegal," "relief should be available to all persons injured by it, or as a consequence of their efforts to resist it." Brief for United States, O. T. 1969, No. 33, p. 34.

Thus, both Sullivan and the United States argued that Sullivan had standing to seek relief for injuries he suffered as a result of the corporation's violation of Freeman's rights—not that Sullivan's own rights under §1982 were violated. And that is the best interpretation of what the

---

[3] In contrast to his argument based on §1982, which he consistently tied to the violation of Freeman's rights, Sullivan also argued that his *own* First Amendment rights were violated:

"Since Sullivan's expulsion was in retaliation for his having obeyed the dictate of the law the expulsion was against public policy, and he should be reinstated. For the law to sanction punishment of a person such as Sullivan for refusing to discriminate against Negroes would be to render nugatory *the rights guaranteed to Negroes* by 42 U. S. C. §§1981, 1982 . . . . Furthermore, by giving sanction to Sullivan's expulsion, the state court deprived Sullivan of *his rights*, guaranteed by the First Amendment to criticize the conduct of the association's directors." Brief for Petitioners, O. T. 1969, No. 33, p. 14 (emphasis added).

Court subsequently held. Tracking the parties' arguments, the Court first concluded that that the corporation's "refus[al] to approve the assignment of the membership share . . . was clearly an interference with Freeman's right to 'lease'" under §1982. 396 U. S., at 237. Only then did it conclude—based on *Barrows* v. *Jackson*, 346 U. S. 249 (1953), a third-party standing case in which another white litigant was permitted to "rely on the invasion of the rights of others," *id.*, at 255—that Sullivan "ha[d] standing to maintain this action." *Sullivan*, 396 U. S., at 237. The word "retaliation" does not appear in the Court's opinion. Nor is there any suggestion that Sullivan would have had "standing" absent the violation of Freeman's rights.

Of course, *Sullivan* is not a model of clarity, and Justice Harlan, writing in dissent, was correct to criticize the "undiscriminating manner" in which the Court dealt with Sullivan's claims. *Id.,* at 251. Sullivan had sought relief both for the corporation's refusal to approve the assignment and for his expulsion. *Id.*, at 253. But in stating that Sullivan had standing to maintain "this action," *id.*, at 237, the Court did not specify what relief Sullivan was entitled to pursue on remand. Lamenting the Court's "failure to provide any guidance as to the legal standards that should govern Sullivan's right to recovery on remand," *id.*, at 252 (dissenting opinion), Justice Harlan provided an instructive summary of the ambiguities in the Court's opinion:

> "One can imagine a variety of standards, each based on different legal conclusions as to the 'rights' and 'duties' created by §1982, and each having very different remedial consequences. For example, does §1982 give Sullivan a right to relief only for injuries resulting from Little Hunting Park's interference with *his* statutory duty to Freeman under §1982? If so, what is Sullivan's duty to Freeman under §1982? Unless

§1982 is read to impose a duty on Sullivan to *protest* Freeman's exclusion, he would be entitled to reinstatement under this standard only if the Board had expelled him for the simple act of assigning his share to Freeman.

   "As an alternative, Sullivan might be thought to be entitled to relief from those injuries that flowed from the Board's violation of *its* 'duty' to Freeman under §1982. Such a standard might suggest that Sullivan is entitled to damages that resulted from Little Hunting Park's initial refusal to accept the assignment to Freeman but again not to reinstatement. Or does the Court think that §1982 gives Sullivan a right to relief from injuries that result from his 'legitimate' protest aimed at convincing the Board to accept Freeman?" *Id.*, at 254–255.

It is noteworthy that of the three possible standards Justice Harlan outlined, the first two clearly depend on a showing that Freeman's §1982 rights were violated. Only the third—"Or does the Court think that §1982 gives Sullivan a right to relief from injuries that result from his 'legitimate' protest"—resembles a traditional retaliation claim and, in context, even it is probably best read to presuppose that Sullivan was protesting an actual violation of Freeman's rights. *Id.,* at 255. Which, if any, of these standards the Court had in mind is anybody's guess. It did not say.

I thus adhere to my view that *Sullivan* is best read as a third-party standing case. That is how the parties argued the case, and that is the most natural reading of the Court's opinion. But even if *Sullivan* could fairly be read as having inferred a freestanding cause of action for retaliation—which I doubt it can, at least not without superimposing an anachronistic outlook on a Court that was not as familiar with retaliation claims as we are today—the

Court's one-paragraph discussion of the issue was, at best, both cursory and ambiguous. This is hardly the stuff of which *stare decisis* is made.

Steadfastly refusing to acknowledge any ambiguity, the Court asserts that it is "not surprising that following *Sullivan*, federal appeals courts concluded, on the basis of *Sullivan* or its reasoning, that §1981 encompassed retaliation claims." *Ante*, at 5. But given *Sullivan*'s use of the word "standing" and its reliance on a third-party standing case, what is unsurprising is that each of the cases the Court cites either characterized the issue as one of standing, *Winston* v. *Lear-Siegler, Inc.*, 558 F. 2d 1266, 1270 (CA6 1977) (characterizing the issue as "whether or not the white plaintiff in this action has standing to sue his former employer under 42 U. S. C. §1981 for discharging him in alleged retaliation for plaintiff's protesting the alleged discriminatory firing of a black co-worker"), or recognized that it was taking a step beyond *Sullivan* in inferring a cause of action for retaliation, *Choudhury* v. *Polytechnic Inst. of N. Y.*, 735 F. 2d 38, 42 (CA2 1984) (stating that the Second Circuit "ha[d] never decided whether §1981 creates a cause of action for retaliation," even though it had previously held, based on *Sullivan*, "that a white person who claimed to have suffered reprisals as a result of his efforts to vindicate the rights of non-whites had standing to sue under §1981"); *Goff* v. *Continental Oil Co.*, 678 F. 2d 593, 598, n. 7 (CA5 1982) (recognizing that *Sullivan* and a previous Fifth Circuit decision relying on *Sullivan* were "essentially standing cases holding that white people can assert civil rights claims when they are harmed by someone's discrimination against blacks," which is distinct from holding that "a particular type of conduct—retaliation for the filing of a §1981 law suit—is actionable in the first place").

Moreover, even if *Sullivan* had squarely and unambiguously held that §1982 provides an implied cause of action

for retaliation, it would have been wrong to do so because §1982, like §1981, prohibits only discrimination based on race, and retaliation is not discrimination based on race.[4] The question, then, would be whether to extend *Sullivan*'s erroneous interpretation of §1982 to §1981. The Court treats this as a foregone conclusion because "our precedents have long construed §§1981 and 1982 similarly." *Ante*, at 4. But erroneous precedents need not be extended to their logical end, even when dealing with related provisions that normally would be interpreted in lockstep.[5]

––––––––––

[4] The majority claims that *Sullivan* "did not embrace" this "linguistic argument." *Ante*, at 10. That is because the argument was not before the Court. The corporation did not argue that §1982's text could not reasonably be construed to create a cause of action for retaliation; nor did Justice Harlan in dissent. No one made this argument because that was not how the issue was framed, either by Sullivan or by the Court. The majority suggests that the argument was "apparent at the time the Court decided *Sullivan.*" *Ibid.* But the only evidence it cites is Justice Harlan's observation that the Court's holding in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968), that §1982 prohibits private as well as governmental discrimination was "in no way required by [§1982's] language." *Sullivan*, 396 U. S., at 241. I fail to see how that observation—or Justice Harlan's further observation that the Court in *Sullivan* had gone "yet beyond *Jones*," *ibid.*—shows that the Court considered and rejected the entirely different argument that §1982's text does not provide a cause of action for retaliation.

[5] For example, we have refused to extend the holding of *J. I. Case Co.* v. *Borak*, 377 U. S. 426 (1964), which inferred a private right of action for violations of §14(a) of the Securities Exchange Act of 1934, to other sections of the Act. *Borak* applied the understanding—later abandoned in *Cort* v. *Ash*, 422 U. S. 66, 78 (1975)—that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute. 377 U. S., at 433. As Chief Judge Easterbrook explained in dissent below, the analogy to the present case is obvious:

"The argument goes that, because *Sullivan* ignored the language of §1982 and drafted an 'improved' version of the statute, we are free to do the same today for §1981, its neighbor. The Supreme Court requires us to proceed otherwise. *Borak* dealt with §14(a) of the Securities Exchange Act of 1934, 15 U. S. C. §78n(a). It was as freewheeling in

Otherwise, *stare decisis*, designed to be a principle of stability and repose, would become a vehicle of change whereby an error in one area metastasizes into others, thereby distorting the law. Two wrongs do not make a right, and an aesthetic preference for symmetry should not prevent us from recognizing the true meaning of an Act of Congress.

The Court's remaining reasons for invoking *stare decisis* require little discussion. First, the Court relies on the fact that *Jackson* interpreted *Sullivan* as having recognized a cause of action for retaliation under §1982. See *ante*, at 3, 9–10. That is true but irrelevant. It was only through loose language and creative use of brackets that *Jackson* was able to assert that *Sullivan* "upheld Sullivan's cause of action under 42 U. S. C. §1982 for '[retaliation] for the advocacy of [the black person's] cause.'" 544 U. S., at 176 (quoting *Sullivan*, 396 U. S., at 237; brackets in original). Of course, *Sullivan* did not use the word "retaliation," did not say anything about a "cause of action," and did not state that Sullivan had rights under §1982. It most certainly did not "interpre[t] a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition." *Jackson*, 544 U. S., at 176. *Jackson*'s assertion that

_____

'interpreting' that law as *Sullivan* was with §1982. Yet the Court has held that the change of interpretive method announced in *Cort* applies to all other sections of the Securities Exchange Act. See *Piper v. Chris-Craft Industries, Inc.*, 430 U. S. 1 (1977) (§14(e)); *Touche Ross & Co. v. Redington*, 442 U. S. 560 (1979) (§17(a)). *Borak* and similar decisions from the 1960s have not been overruled, but we have been told in no uncertain terms that they must not be extended. Indeed, in *Virginia Bankshares, Inc. v. Sandberg*, 501 U. S. 1083 (1991), the Court declined to apply *Borak* to a portion of §14(a) that had not been involved in *Borak*. So that case has been limited to a single sentence of one subsection. Why, then, may the method of *Sullivan* be applied to other sections of the Civil Rights Act of 1866 despite intervening precedent?" 474 F. 3d, at 410–411 (citations omitted).

*Sullivan* "plainly held that the white owner could maintain his *own* private cause of action under §1982," *id.*, at 176, n. 1, misses the point entirely. While *Sullivan* held that "the white owner" had standing to maintain his own *suit*, it said nothing to suggest that he could sue to vindicate his own *right* to be free from retaliation under §1982. Rather, as I have explained, Sullivan's "standing" was derivative of the violation of Freeman's rights. In short, *Jackson*'s characterization of *Sullivan* was erroneous, and I am aware of no principle of *stare decisis* that requires us to give decisive weight to a precedent's erroneous characterization of another precedent—particularly where, as here, the cases involved different statutes, neither of which was the statute at issue in the case at bar.

Second, the Court appears to give weight to the fact that, since Congress passed the Civil Rights Act of 1991, §101, 105 Stat. 1071, "the lower courts have uniformly interpreted §1981 as encompassing retaliation actions." *Ante*, at 8. This rationale fares no better than the others. The Court has never suggested that rejection of a view uniformly held by the courts of appeals violates some principle of *stare decisis*. To the contrary, we have not hesitated to take a different view if convinced the lower courts were wrong. Indeed, it has become something of a dissenter's tactic to point out that the Court has decided a question differently than every court of appeals to have considered it. See, *e.g.*, *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 278, n. 11 (2003) (THOMAS, J., concurring in part, concurring in result in part, concurring in judgment in part, and dissenting in part); *Buckhannon Board & Care Home, Inc.* v. *West Virginia Dept. of Health and Human Resources*, 532 U. S. 598, 643 (2001) (GINSBURG, J., dissenting); *Sandoval*, 532 U. S., at 294 (STEVENS, J., dissenting); *Jones* v. *United States*, 526 U. S. 227, 254 (1999) (KENNEDY, J., dissenting); *McNally* v. *United States*, 483 U. S. 350, 365 (1987) (STEVENS, J.,

dissenting). The Court does not explain what makes this particular line of lower court authority any more sacrosanct than those we have rejected in the past.

Of course, lower court decisions may be persuasive, and when the Court rejects the unanimous position of the courts of appeals, it is fair to point out that fact. But the point has traction only to the extent it tends to show that the Court's reasoning is flawed on the merits, as demonstrated by the number of judges who have reached the opposite conclusion. See, *e.g.*, *Buckhannon*, *supra*, at 643–644 (GINSBURG, J., dissenting) ("When this Court rejects the considered judgment prevailing in the Circuits, respect for our colleagues demands a cogent explanation"). Unlike decisions of this Court, decisions of the courts of appeals, even when unanimous, do not carry *stare decisis* weight, nor do they relieve us of our obligation independently to decide the merits of the question presented. That is why, when we have affirmed a view unanimously held by the courts of appeals, we have done so (at least until today) not because we gave precedential weight to the lower courts' decisions, but because we agreed with their resolution of the question on the merits. See, *e.g.*, *Gonzalez* v. *Crosby*, 545 U. S. 524, 531 (2005) ("Virtually every Court of Appeals to consider the question has held that such a pleading . . . is in substance a successive habeas petition . . . . We think those holdings are correct"); *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, 362 (1991) ("Thus, we agree with every Court of Appeals that has been called upon to apply a federal statute of limitations to a §10(b) claim").

## III

As in *Jackson*, "[t]he question before us is only whether [§1981] prohibits retaliation, not whether prohibiting it is good policy." 544 U. S., at 195 (THOMAS, J., dissenting). "By crafting its own additional enforcement mechanism,

the majority returns this Court to the days in which it created remedies out of whole cloth to effectuate its vision of congressional purpose." *Ibid.* That the Court does so under the guise of *stare decisis* does not make its decision any more justifiable. Because the text of §1981 provides no basis for implying a private right of action for retaliation, and because no decision of this Court holds to the contrary, I would reverse the judgment below.