## TRACY THURDIN *vs.* SEI BOSTON, LLC.

Suffolk. May 5, 2008. - October 24, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Constitutional Law,* Sex discrimination. *Anti-Discrimination Law,* Employment, Sex. *Employment,* Discrimination.

Discussion of G. L. c. 93, § 102 (*a*), one of the provisions of the Massachusetts Equal Rights Act. [439-440]

Discussion of G. L. c. 151B and the administrative and judicial avenues for redress of employment discrimination in violation of the statute. [440-443]

A Superior Court judge erred in dismissing a civil action alleging gender and pregnancy discrimination against the plaintiff's employer, where although the employer, which had fewer than six employees, was not amenable to suit under G. L. c. 151B, the plaintiff could nonetheless assert a claim under the Massachusetts Equal Rights Act (MERA), G. L. c. 93, § 102 (*a*), a result confirmed by the plain language of the two statutes and case law [443-448], as well as the legislative intent evident from the history of MERA [448-452]. BOTSFORD, J., concurring, with whom MARSHALL, C.J., and GREANEY, J., joined. CORDY, J., dissenting, with whom COWIN, J., joined.

A Superior Court judge erred in dismissing a civil action alleging gender and pregnancy discrimination under the Massachusetts Equal Rights Act, G. L. c. 93, § 102, against the plaintiff's employer (which, having fewer than six employees, was not amenable to suit under G. L. c. 151B), where the phrase "make and enforce contracts" in G. L. c. 93, § 102, was not limited to the hiring phase of employment, but rather covered discriminatory treatment during the course of employment. [452-455] BOTSFORD, J., concurring, with whom MARSHALL, C.J., and GREANEY, J., joined. CORDY, J., dissenting, with whom COWIN, J., joined.

CIVIL ACTION commenced in the Superior Court Department on March 8, 2006.

A motion to dismiss was heard by *John C. Cratsley*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Daniel W. Rice* for the plaintiff.

*Joseph S. Berman* (*Kenneth J. Rodriguez* with him) for the defendant.

The following submitted briefs for amici curiae:

*James S. Weliky* for Massachusetts Employment Lawyers' Association & others.

*Jo Ann Shotwell Kaplan & Martin Newhouse* for New England Legal Foundation & others.

*Patricia A. Washienko & Anne Josephson* for Union of Minority Neighborhoods & others.

IRELAND, J. We transferred this case from the Appeals Court on our own motion to consider whether an employee who is unable to pursue an employment discrimination claim against her former employer pursuant to G. L. c. 151B, because the employer had fewer than six employees, may instead assert a claim under G. L. c. 93, § 102, one of the provisions of the Massachusetts Equal Rights Act (MERA). A Superior Court judge entered an order granting the defendant's motion to dismiss the plaintiff's complaint charging the defendant with sex discrimination pursuant to MERA. Because we conclude that an employee may assert a sex discrimination claim under MERA where an employer is not within the ambit of G. L. c. 151B, we vacate the order and judgment dismissing the complaint and remand the case for further proceedings.

*Facts and procedure.* We set forth the facts, taking as true all the allegations in the plaintiff's complaint and drawing all inferences in her favor. *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995).

On February 15, 2005, the defendant, which provides information technology services to businesses, offered the plaintiff a position as an onsite information technology consultant. The plaintiff began working on March 15, 2005, reporting to the defendant's managing principal, Vicki Hudson. On April 11, the plaintiff told Hudson that she was pregnant and had a due date of June 27. The plaintiff alleges that she could perform all of the essential functions of her job, including onsite consulting.

The next day, Hudson told the plaintiff that she had spoken to Daniel Pierce, the owner of Systems Evolution, Inc., in Mason, Ohio. Hudson stated that she and Pierce were upset that the plaintiff was pregnant and requested that the plaintiff voluntarily take an unpaid leave of absence. The plaintiff refused.

Hudson told the plaintiff that she had acted unethically by

failing to reveal, during her job interview, that she was pregnant.[1] Hudson stated that the defendant could not place the plaintiff onsite with clients due to her pregnancy and that it would be very costly to have the plaintiff "on the bench" during the term of her pregnancy and while on maternity leave. Hudson went on to say that the plaintiff was unfairly burdening the defendant with her pregnancy because the defendant is a small company trying to develop new business in the Boston area. The plaintiff asked Hudson to view the plaintiff's situation from her perspective, to which Hudson remarked that it was "not [her] problem."

After this conversation, the plaintiff telephoned her attorney, a friend, and her husband, and relayed that she believed she was being discriminated against due to her pregnancy. Another employee overheard these calls and reported them to Hudson. Hudson ordered the plaintiff to leave the office and to "have a conversation with [herself] in the mirror and come back tomorrow with a better attitude." By a letter dated April 20, 2005, but not given to the plaintiff until April 22, the defendant placed the plaintiff on unpaid administrative leave because of her pregnancy. The plaintiff did not return to work.

Prior to receiving the letter, the plaintiff filed a charge of discrimination against the defendant with the Equal Employment Opportunity Commission (EEOC) and with the Massachusetts Commission Against Discrimination (MCAD), thus pursuing administrative remedies under Federal and State law pursuant to Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (2000) (Title VII), and G. L. c. 151B.[2] The plaintiff's complaint appears to have been closed by the EEOC for lack of jurisdiction after the defendant contended that it had only three employees.

---

[1] We note that 804 Code Mass. Regs. § 3.02 (1995), promulgated by the Massachusetts Commission Against Discrimination (MCAD), states that an employer may not make "[i]nquiries into whether [a job] applicant has children, plans to have children, or has child care arrangements." See *Lysak* v. *Seiler Corp.*, 415 Mass. 625, 627, 628 (1993) (discharge of pregnant employee for misrepresentation proper where employee volunteered that she did not plan to have any more children, when she was in fact pregnant and where employer made no illegal inquiry).

[2] If a complaint is filed with the Equal Employment Opportunity Commission (EEOC), it also is considered to be filed with the MCAD. *Davis* v. *Lucent Techs., Inc.*, 251 F.3d 227, 230 n.1 (1st Cir. 2001).

In March, 2006, the plaintiff filed a complaint in the Superior Court alleging gender and pregnancy discrimination under MERA. After answering the complaint, the defendant filed a motion to dismiss or, in the alternative, a motion for judgment on the pleadings. The judge found that it is undisputed that the defendant employed less than six people. He concluded that G. L. c. 151B is the exclusive remedy in employment discrimination cases and that, as evidenced by the statute's definition of "employer," the Legislature intended that discrimination claims would not lie against employers having fewer than six employees.[3] The judge also concluded that, in any event, the plaintiff did not have an alternative remedy under MERA because the statute's phrase "make and enforce contracts" applies only to claims of discrimination during the hiring process. To support his conclusion, the judge relied on the United States Supreme Court's interpretation of comparable language that existed in 42 U.S.C. § 1981, at the time of its decision in *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 176-177 (1989), abrogated by the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071.[4] A judgment entered dismissing the plaintiff's complaint. The plaintiff appealed.

*Statutory scheme.* We begin with an overview of the pertinent provisions of the relevant statutes.

---

[3]Unless otherwise indicated, "small" employers or language referring to G. L. c. 151B being available or unavailable refers to whether an employer falls within the definition of "employer" pursuant to G. L. c. 151B, § 1 (5) (providing that statute does not cover employers with fewer than six employees).

[4]As discussed *infra*, in 1991, Congress amended § 1981 to make it clear that the phrase "make and enforce contracts" covered the treatment of employees in the course of their employment, in response to the holding in *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 176-177 (1989), that had narrowed the reach of § 1981 to only the formation of an employment contract. The amendment was consistent with the United States Supreme Court's interpretation of the phrase "make and enforce contracts" prior to the *Patterson* decision. See, e.g., *Saint Francis College* v. *Al-Khazraji*, 481 U.S. 604, 606, 613 (1987) (claim under § 1981 for racial discrimination in denial of tenure proper); *Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454, 455, 459-460 (1975) (alleging that employer engaged in racial discrimination with respect to seniority and job assignments; § 1981, if timely, is remedy against private discrimination). See also *CBOCS West, Inc.* v. *Humphries*, 128 S. Ct. 1951, 1957 (2008) (discussing intent of Congress in amending § 1981).

*MERA.* General Laws c. 93, § 102 (*a*), inserted by St. 1989, c. 332, provides, in pertinent part:

> "*All persons* within the commonwealth, regardless of *sex*, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, *to make and enforce contracts*, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other"[5] (emphasis supplied).

The language of § 102 (*a*) drew on language in 42 U.S.C. §§ 1981 and 1982 (2000), as they existed at the time, but expanded the category of those covered, as §§ 1981 and 1982 cover only race. See Johnson, The 1989 Massachusetts "Equal Rights Law": A Short History, 34 B.B.J. 17, 18 (1990) (Johnson) (MERA added sex and religion to language fashioned from §§ 1981 and 1982). The statute was proposed in anticipation of the United States Supreme Court's *Patterson* decision. *Id.* at 17. General Laws c. 93, § 103, inserted by St. 1990, c. 156, extended the rights afforded under § 102 to persons with a handicap or over forty years of age, as defined in G. L. c. 151B, § 1 (8), (17), and requires a "reasonable accommodation" concerning those rights.

*General Laws c. 151B.* General Laws c. 151B is an antidiscrimination statute originally enacted in 1946. St. 1946, c. 368, § 4. General Laws c. 151B, § 4 (1), (1A), (1B), and (3), as amended through St. 2004, c. 355, § 1, forbids discrimination in employment on the basis of race, color, religious creed, national origin, sex, sexual orientation, genetic information, ancestry, age, or handicap.[6] For purposes of the statute, "employer" is defined to expressly exclude "any employer with fewer than six

---

[5]The other subsections of G. L. c. 93, § 102, which concern jurisdiction of the Superior Court, remedies, costs, fees, and the burden of proof, are not at issue in this case.

[6]In this regard, the scope of G. L. c. 151B is broader than its Federal counterpart, which covers only race, color, creed or national origin. 42 U.S.C. § 2000e-2.

persons in his employ."[7] G. L. c. 151B, § 1 (5). The Massachusetts Commission Against Discrimination (MCAD) is the administrative agency that enforces the statute. G. L. c. 151B, §§ 1 (7), 3, 5.

General Laws c. 151B, § 9, first par., provides that the statute "shall be construed liberally for the accomplishment of its purposes." It states that "any law inconsistent with any provision of this chapter shall not apply, *but nothing contained in this chapter shall be deemed to repeal any provision of any other law of the commonwealth relating to discrimination*" (emphasis added).[8] Section 9, second and third pars., also states that ninety days (but not later than three years) after filing a complaint with the MCAD, a plaintiff may choose to bring an action for damages (actual and punitive) in the Superior Court, Probate and Family Court, or Housing Court.

Thus the statute provides an aggrieved party with "two largely

---

[7]A footnote to a 1946 version of G. L. c. 151B, § 1 (5), states, "Although the committee received a number of suggestions to reduce the exceptions in this section, it was decided after careful consideration to leave it unchanged. This section *exempts those who employ less than six persons for reasons of practical administration and to exempt more or less personal relationship, small business and family farms from the scope of the bill*" (emphasis added). 1946 House Doc. No. 400, at 12 n.1.

We also note that the Federal employment discrimination statute applies to employers with no less than fifteen employees. 42 U.S.C. § 2000e(b).

[8]Statute 2002, c. 223, § 2, deleted a specific list of statutes that the provisions of G. L. c. 151B would not repeal. General Laws c. 151B, § 9, as amended through St. 1991, c. 323, §§ 3, 4, read:

"The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provision hereof shall not apply, but nothing contained in this chapter shall be deemed to repeal any provision of chapter one hundred and forty-nine which establishes standards, terms or conditions of employment which are applicable to females, section ninety-eight of chapter two hundred and seventy-two or any other law of this commonwealth relating to discrimination because of race, color, religious creed, national origin, or ancestry, and nothing contained in this chapter shall be deemed to repeal sections twenty-four A to twenty-four J, inclusive, of chapter one hundred and forty-nine or any other law of the commonwealth relating to discrimination because of age; but, as to acts declared unlawful by section four, the procedure provided in this chapter shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned."

independent avenues for redress of violations of [G. L. c. 151B], one through the MCAD (G. L. c. 151B, §§ 5-6), and the other in the courts (G. L. c. 151B, § 9)." *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 565, cert. denied sub nom. *Wilfert Bros. Realty Co.* v. *Massachusetts Comm'n Against Discrimination*, 543 U.S. 979 (2004) (*Stonehill College*), quoting *Brunson* v. *Wall*, 405 Mass. 446, 452 (1989).[9] However, the judicial remedy is available only after a party has first filed a complaint with the MCAD,[10] and while administrative procedures are pending pursuant to G. L. c. 151B, §§ 4 and 5, that procedure is exclusive. G. L. c. 151B, § 9, as amended through St. 2002, c. 223, § 2. Moreover, if G. L. c. 151B is available, an aggrieved employee may not bring a claim under another statute in the first instance.[11] *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 586 (1994) (*Charland*) (where G. L. c. 151B applies, it is exclusive remedy for employment discrimination).

Furthermore, "the primary purpose of an administrative proceeding before the MCAD is to vindicate the public's interest in reducing discrimination in the workplace." *Stonehill College, supra* at 563. During the administrative process, the commission, not the complainant, prosecutes the claim, and "the commission is empowered to fashion equitable remedies designed chiefly to *protect and promote the broader public interest in eradicating systemic discrimination*" (emphasis added).[12] *Id.*

---

[9]The remedies available under G. L. c. 151B, §§ 5 and 9, differ. For example, among other things, § 9, second and third pars., permits those who choose to file a civil action to collect punitive and actual damages as well as attorney's fees, while § 5, second and fourth pars., permits the MCAD to fashion remedies that include reinstatement and leveling a civil penalty under certain conditions.

[10]In 2002, the Legislature increased the amount of time a plaintiff has to file a complaint for discrimination from six months to 300 days. G. L. c. 151B, § 5, as amended through St. 2002, c. 223, § 1.

[11]It appears that Federal law allows a suit to be filed under § 1981 before an employee exhausts remedies under Title VII. See *Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454, 461 (1975) (noting that statutory scheme created by Congress that allows filing of lawsuit under § 1981 "might tend to deter" conciliation efforts under Title VII). It is beyond the scope of this appeal whether, once an employee chooses the judicial route, he or she also may assert a claim pursuant to G. L. c. 93, § 102 or § 103.

[12]Pursuant to G. L. c. 151B, § 6, decisions or orders by the MCAD are subject to judicial review under G. L. c. 30A.

If the complainant chooses the judicial route to recover damages for his or her individual discrimination, the MCAD takes no further action. *Id.* Rather, the case is considered no longer "pending" pursuant to G. L. c. 151B, §§ 4, 5, and 9. *Charland, supra* at 585.

*Discussion.* 1. In his written decision granting the defendant's motion to dismiss, the judge stated:

> "[I]t is apparent that [the Legislature] contemplated the precise issue currently before this Court. [It] considered and resolved [in the negative] the question of whether the antidiscrimination statute allows for a cause of action in pregnancy-related discrimination cases involving employers with [six] or fewer employees. . . . [Its] intent is demonstrated in the definition of an employer provided in [G. L.] c. 151B. Employees of such smaller companies are not within the scope of the statute's intended protections . . . [and] given the explicit text they enacted [it] must have believed that the benefits to smaller businesses outweighed all other considerations."

In support of this conclusion, the judge stated that in the case of sexual harassment, the Legislature enacted G. L. c. 214, § 1C, to cover employees working for small firms. He concluded that because the Legislature did not enact a statute to cover pregnancy-related discrimination for employees of small firms, it was evidence that the Legislature intended G. L. c. 151B to be the exclusive remedy for such discrimination.

The defendant argues that the judge's interpretation of the statute is correct because G. L. c. 151B's definition of "employer" is plain and unambiguous, and because there was a footnote in the bill proposed in 1946 stating that the Legislature deliberately excluded small businesses from the scope of the statute. See note 7, *supra*.[13] The defendant further contends that this position is

---

[13]We do not disagree with the defendant's contention that the Legislature deliberately exempted small employers from the "scope" of G. L. c. 151B. The exemption from the "scope" of the statute is susceptible of an interpretation that the Legislature meant to exempt small employers from MCAD's administrative process. *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 563, cert. denied sub nom. *Wilfert Bros. Realty Co.* v. *Massachusetts Comm'n Against Discrimination*, 543 U.S. 979 (2004) (MCAD process designed to eradicate systemic discrimination).

bolstered by G. L. c. 149, § 105D, which provides, in certain circumstances, maternity leave for female employees, and for the restoration of their job (or similar position) and protection of, inter alia, seniority and level of pay.[14] The statute states that an employer "shall be defined as in [G. L. c. 151B, § 1 (5)]." Although the defendant does not argue that maternity *leave* is at issue here, it argues that this statute is evidence that small employers were exempted deliberately from pregnancy discrimination. We disagree.

Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent. See *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986), and cases cited. Moreover, we construe civil rights statutes liberally, giving effect to every provision to produce a consistent body of law. See, e.g., *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554 (1996); *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985), citing 3 C. Sands, Sutherland Statutory Construction § 72.05, at 392 (4th ed. 1974) (civil rights statutes are remedial and entitled to liberal construction). "The rule for the construction of remedial statutes is that cases within the reason, though not within the letter, of a statute shall be embraced by its provisions . . . ." *Batchelder* v. *Allied Stores Corp.*, *supra*, quoting 2A C. Sands, Sutherland Statutory Construction § 54.04, at 570 (4th ed. 1974). We also assume the Legislature is aware of existing statutes when it enacts subsequent ones. *Green* v. *Wyman-Gordon Co.*, *supra*. Furthermore, where there is an express exception in a statute, it comprises the only limit on the operation of the statute and no others will be implied. *General Elec. Co.* v. *Department of Envtl. Protection*, 429 Mass. 798, 805-806 (1999), quoting *District Attorney for the Plymouth Dist.* v. *Selectmen of Middleborough*, 395 Mass. 629, 633 (1985).

Here, there is nothing in the plain language of § 102 of MERA that excludes small employers from its application. It expressly states, in pertinent part, that "[a]ll persons" shall have a right to "make and enforce contracts" without regard to sex.[15]

---

[14]General Laws c. 149, § 105D, provides for up to eight weeks' leave if a female employee has completed an employer's initial probationary period, if there is one, and, otherwise, if she has worked full time for three consecutive months.

[15]Discrimination related to pregnancy and pregnancy-related disabilities is a

Moreover, there is nothing in the plain language of G. L. c. 151B stating that, where it does not apply, aggrieved parties are excluded from using other statutes to vindicate their right to be free from employment discrimination. Rather, the statute expressly states that *"nothing contained in this chapter* shall be deemed to repeal any provision of *any other law* of this commonwealth relating to discrimination," unless it is inconsistent with G. L. c. 151B (emphasis added). G. L. c. 151B, § 9, first par. The statute's phrase "nothing contained in this chapter" would include the definition of "employer" in G. L. c. 151B, § 1 (5), because § 9 allows no exception, reflecting a determination by the Legislature that antidiscrimination statutes should be applied as written. See *General Elec. Co.* v. *Department of Envtl. Protection, supra.* In addition, there is nothing "inconsistent" between the two statutes because they do not cover the same employers and provide different remedies.[16]

We also do not agree with the defendant that our *Charland* decision supports its interpretation of G. L. c. 151B. In *Charland*, the plaintiff failed to file a timely complaint with the MCAD and filed suit in the Superior Court under MERA. The court's conclusion that G. L. c. 151B is the "exclusive remedy" for employment discrimination because "it is unlikely . . . the Legislature intended to create a parallel and competing alternative to dealing with the problem of employment discrimination," was expressly qualified by the words "where applicable." *Charland, supra* at 584, 586. The *Charland* court discussed *Melley* v. *Gillette Corp.,* 397 Mass. 1004 (1986), and *Mouradian* v. *General Elec. Co.,* 23 Mass. App. Ct. 538, 541-542 (1987), where G. L. c. 151B did apply, and where the Appeals Court concluded that it would not, respectively, create a new common-law cause of action or permit an action under the Massachusetts Civil Rights

form of sex discrimination. *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 161 (1978).

We also note that neither party argues that the provision in G. L. c. 93, § 102 (*a*), "except as is otherwise provided or permitted by law," is applicable here. See *State* v. *Stevens,* 912 A.2d 1229, 1233 (Me. 2007) (phrase "except as otherwise provided by law" refers to explicit provisions in law).

[16]The defendant urges this court not to turn a "blind eye" to the Legislature's decision to exclude small employers from antidiscrimination laws. However, it does not address this particular provision in G. L. c. 151B, § 9, first par.

Act, G. L. c. 12, §§ 11H and 11I, in lieu of G. L. c. 151B. See *Charland, supra* at 585-586. However, *Charland* did not state that there were no alternative remedies where G. L. c. 151B did not apply. Rather, it quoted this portion of the *Mouradian* case: "There may be a case in which the termination of an at-will employee could give rise to a tenable complaint seeking relief under G. L. c. 12, §§ 11H and 11I." *Id.* at 586, quoting *Mouradian* v. *General Elec. Co., supra* at 543.

The *Charland* court went on to state that its decision was in keeping with its decisions (predating MERA) in *O'Connell* v. *Chasdi,* 400 Mass. 686 (1987), and *Comey* v. *Hill,* 387 Mass. 11 (1982). *Charland, supra.* The court stated that the *O'Connell* case held that the exclusivity provisions of G. L. c. 151B "do not preclude an independent claim of a violation of an employee's equal protection rights under art. 1 of the Declaration of Rights."[17] *Charland, supra.* The court also stated that the *Comey* case held that an employee could maintain a tort claim based on common-law principles that existed prior to the adoption of G. L. c. 151B. *Id.* Thus, we do not read *Charland* to stand for the proposition that G. L. c. 151B is the exclusive remedy for all employment discrimination claims.

Cases subsequent to MERA's enactment support our reading of *Charland.* In *Agin* v. *Federal White Cement, Inc.,* 417 Mass. 669, 670 (1994), the court was faced with a reported question similar to the one here, where an employee filed an age discrimination complaint pursuant to § 103 of MERA, and remanded the case because there had been no finding whether G. L. c. 151B applied to the employer. *Id.* at 672-673. However, the court did not state that if G. L. c. 151B was not available, the plaintiff could not use MERA. In addition, this court has stated in two other cases that if G. L. c. 151B is not available for an employee alleging sexual harassment, the sexual harassment statute, G. L. c. 214, § 1C, is available as an alternative. Compare *Guzman* v. *Lowinger,* 422 Mass. 570, 572 (1996) (G. L. c. 151B unavailable), with *Green* v. *Wyman-Gordon Co.,* 422 Mass. 551, 554-555 (1996) (G. L. c. 151B available). In *Guzman* v. *Lowinger, supra,* the court explained its holding by stating that there was no

---

[17]No constitutional issue has been raised in this appeal.

indication that the Legislature intended to create duplicative remedies for sexual harassment. Accord *Charland, supra* at 586.

Concerning the existence of two separate statutes that covered sexual harassment, the court stated, "It is true that the result we reach creates somewhat of an anomaly. Employees of larger concerns must pursue their claims first at the [MCAD], while employees of smaller scale employers can bypass the MCAD and bring their actions directly in the Superior Court." *Guzman* v. *Lowinger, supra* at 572. This observation did not, however, change the court's conclusion, even though it stated that it was "at a loss to perceive in the statutory framework a reasoned basis for this distinction." *Id.* See generally *Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454, 461 (1975) (statutory scheme created by Congress allows filing of lawsuit under § 1981, which "might tend to deter" conciliation efforts under Title VII).

In *Green* v. *Wyman-Gordon Co., supra* at 557-558, the court stated that because G. L. c. 151B had been available and the plaintiff timely did not file a complaint with the MCAD, the plaintiff not only could not assert a claim under G. L. c. 214, § 1C, but she also was precluded from asserting claims under other statutes, including MERA. However, the court did not state that MERA could not be used where G. L. c. 151B did not apply. Indeed *Green* v. *Wyman-Gordon Co., supra* at 553, discussed *O'Connell* v. *Chasdi, supra* at 693 & n.9, where, because G. L. c. 151B did not apply, the plaintiff was allowed to maintain an action under the Massachusetts Civil Rights Act. See *Jancey* v. *School Comm. of Everett*, 421 Mass. 482, 495-496 (1995) (where female plaintiffs used judicial route to vindicate rights, court rejected argument that exclusive remedy for pay discrimination is G. L. c. 151B).

Thus we conclude that a party aggrieved by employment discrimination based on pregnancy who is precluded from using G. L. c. 151B may assert a claim under MERA. In sum, our conclusion is amply supported, most importantly by the plain language of the two civil rights statutes, including the express language of G. L. c. 151B, § 9, first par., which states that "nothing" in G. L. c. 151B is to be read to repeal any other antidiscrimination statute. It is clear from G. L. c. 93, § 103, which refers to G. L.

c. 151B for the definitions of "handicap" and "age," that the Legislature was aware of the existence of G. L. c. 151B and its provisions. Thus, when the Legislature streamlined the language of G. L. c. 151B, § 9, first par., in 2002, see note 8, *supra*, it could have listed MERA as an exemption from the express language that "nothing" G. L. c. 151B would "be deemed to repeal" other antidiscrimination statutes, but it did not. See *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985), citing 2A C. Sands, Sutherland Statutory Construction § 54.04, at 570 (4th ed. 1974) ("cases within the reason, though not within the letter, of a statute shall be embraced by its provisions").

Furthermore, as discussed, our case law supports the conclusion that small employers could be covered by other statutes even if it creates an anomaly in terms of the course of action employees must take depending on the size of their employer. *Guzman* v. *Lowinger, supra* at 572. The court also has stated that one of the purposes of the procedures before the MCAD is to eradicate systemic discrimination, which, common sense would dictate, would include larger employers, whose impact on the public would be greater. See *Stonehill College, supra* at 563. See also *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 45 (1974) (one purpose of Title VII is to vindicate important congressional policy against discriminatory employment practices).

Moreover, we are informed that according to statistics for 2005 and 2007 from the United States Department of Labor Bureau of Labor Statistics and the United States Census Bureau, over fifty-eight per cent of businesses in the Commonwealth employed fewer than five employees. Although we do not know what percentage of those employers are wholly family-owned and run, given the liberal construction required for interpreting civil rights statutes, we cannot conclude that the Legislature meant to exempt a potential majority of the employers in the Commonwealth from its antidiscrimination laws.[18]

Our discussion of the reasons for our conclusion that the

---

[18]The parties have not supplied, and an extensive, but not exhaustive, search has not revealed, information whether any other jurisdictions have adopted a statute similar to MERA (and how they have reconciled any State employment discrimination statutes). However, there are cases in other jurisdictions where employees of small employers have asked courts to allow them to assert a wrongful discharge claim based on discrimination, usually as a public

plaintiff in this case may assert a claim under MERA could end here. However, this court has occasionally looked at the history and purpose of unambiguous statutes to determine legislative intent. See *Green* v. *Wyman-Gordon Co.*, *supra* at 554 n.4, citing *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986). See also *General Elec. Co.* v. *Department of Envtl. Protection*, 429 Mass. 798, 802 (1999), quoting *Massachusetts Community College Council MTA/NEA* v. *Labor Relations Comm'n*, 402 Mass. 352, 354 (1988) (stating that legislative history supports court's conclusion, although generally court "will not engage . . . in an analysis of a statute's legislative history to seek justification for a particular construction, where the statutory language at issue suggests no ambiguity of meaning").

Here, the available, albeit informal, history is relevant not only to MERA's application to small employers in light of G. L. c. 151B, but also to the interpretation that should be afforded the phrase "make and enforce contracts" in § 102.[19]

In 1989, after oral argument in the *Patterson* case, the United

policy exception to the rule that one can be fired for any reason. Some jurisdictions have allowed such a claim. See, e.g., *Badih* v. *Myers*, 36 Cal. App. 4th 1289, 1292-1293, 1296 (1995) (pregnancy discrimination); *Molesworth* v. *Brandon*, 341 Md. 621, 628 (1996) (sex discrimination); *Collins* v. *Rizkana*, 73 Ohio St. 3d 65, 74 (1995) (sexual harassment); *Roberts* v. *Dudley*, 140 Wash. 2d 58, 60, 77 (2000) (pregnancy discrimination); *Williamson* v. *Greene*, 200 W. Va. 421, 424 (1997) (sex discrimination and harassment). Others have held that where the Legislature set limitations in the State employment discrimination statute, small employers could not be sued for discrimination. See, e.g., *Jennings* v. *Marralle*, 8 Cal. 4th 121, 135-136 (1994) (age discrimination); *Chavez* v. *Sievers*, 118 Nev. 288, 291 (2002) (racial discrimination); *Brown* v. *Ford*, 905 P.2d 223, 227-228 (Okla. 1995) (sexual harassment); *Burton* v. *Exam Ctr. Indus. & Gen. Med. Clinic, Inc.*, 994 P.2d 1261, 1265-1267 (Utah 2000) (age discrimination).

[19]A search has not produced any detailed official history of MERA. But see generally *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U.S. 273, 289-295 (1976) (discussing statements from bill supporters and sponsors in interpreting statute); *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 48 n.9 (1974) (using "interpretative memorandum" from bill's sponsor for guidance in statutory interpretation); *Commonwealth* v. *Roucoulet*, 413 Mass. 647, 651 n.7 (1992) (referring to letter of Governor proposing legislation as support for court's interpretation of statute); 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 48:10, at 584, 587, § 48:11, at 594-595 (7th ed. 2007) (discussing value of statements made by bill sponsors and legislative staff).

States Supreme Court requested further briefing and ordered re-argument on an issue that was not raised by either party: whether the Court should reexamine its decision in *Runyon* v. *McCrary*, 427 U.S. 160, 173 (1976) (*Runyon*), which held that § 1981 applied to private parties. *Patterson* v. *McLean Credit Union*, 485 U.S. 617 (1988). See *id.* at 619-620 (Blackmun, J., dissenting, with whom Brennan, Marshall, and Stevens, JJ., joined) (Court asks parties to rebrief and reargue issue not raised in their appeal).

In direct response to the United States Supreme Court's request for further briefing in the *Patterson* matter, the office of then Attorney General James Shannon approached the then Boston Bar Association president and asked for assistance in drafting a statute to "ensure that a reversal of *Runyon* would not leave Massachusetts civil rights victims without remedy."[20] Johnson, *supra* at 17.[21] In a prepared statement to the Committee on Commerce and Labor,[22] dated April 24, 1989, the Boston Bar Association pointed out that the bill's protection "encompassed those categories of individuals protected by Article I of the Massachusetts constitution, i.e., sex, race, color, creed or national origin," and "excepts from its reach certain legitimate, state-sanctioned activities, e.g., religious schools and single-sex universities."[23] It was intended that MERA apply to all aspects of relationships within its purview and that its remedies not be dependent on any other remedial scheme, including G. L. c. 151B.

---

[20]A seven-member committee was recruited to draft the bill and included a professor of law, a Superior Court judge, and members of the Office of the Attorney General, the Boston Bar Association, the Civil Liberties Union of Massachusetts, and the Lawyers' Committee for Civil Rights. See Johnson, The 1989 Massachusetts "Equal Rights Law": A Short History, 34 B.B.J. 17, 17 (1990) (Johnson).

[21]Johnson was listed as the person to contact in a bill summary provided by one of the bill's sponsors, Senator John Olver. In 1990, Johnson authored an article concerning MERA in order to "provide the history of the legislation, [and] to attempt to document the General Court's understanding of the bill during its consideration." Johnson, *supra*. See generally 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction, *supra*.

[22]This committee held hearings on the bill. See Johnson, *supra* at 17-18.

[23]The concern was that MERA could be read to encroach on personal relationships or include discriminatory acts "allowed" under Massachusetts law, e.g., excluding religious institutions from the definition of "employer" under G. L. c. 151B. Johnson, *supra* at 19.

*Id.* at 18. This assertion is supported by a bill summary for 1989 House Doc. No. 4654 (which eventually was enacted as G. L. c. 93, § 102), issued by one of its sponsors, Senator John Olver. It states that the bill "is a comprehensive civil rights bill sponsored by the Boston Bar Association. Its aim is to ensure freedom from discrimination in legal contracts, *employment* and access to housing for minorities and women in Massachusetts" (emphasis added). The summary further states that if the United States Supreme Court reversed *Runyon,* it "would deprive minorities of a significant weapon against bias by *employers* or private schools" (emphasis added).[24]

Ultimately, the *Patterson* Court did not reverse *Runyon* in terms of § 1981's application to discrimination by private parties. However, it narrowed the interpretation of the phrase "make and enforce contracts" to apply only to discrimination during the creation of an employment contract and not to discrimination that occurred during the course of employment as the employee had alleged in her lawsuit. *Patterson* v. *McLean Credit Union,* 419 U.S. 164, 176-177 (1989) (*Patterson*).

Although *Patterson* was decided on June 15, 1989, before MERA was enacted, the Massachusetts House already had voted to pass it in May, 1989. Johnson, *supra* at 18. Despite *Patterson,* the Legislature intended MERA to apply to "all aspects of the employment relationship, including harassment and discharge." *Id.* At this point in the bill's progress through the Legislature, some thought was given to amending the bill to make it clear that it applied to the course of employment, *id.,* but "it was concluded that such amendment was not necessary. Throughout the drafting process it was assumed that the Massachusetts Supreme Judicial Court would give the obvious and intended meaning and scope to the clear language of the statute." *Id.* at 19. This account is supported by a "fact sheet" issued by Senator John Olver after the Senate approved the bill on July 19, 1989,[25] which included a discussion of the interpretation of § 1981 under *Runyon* and addressed the impact of the *Patter-*

[24]One concern appears to have been that the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I, would not offer enough protection, as that statute requires proof of threats or coercion.

[25]It would appear that the bill was never modified or amended while it was

*son* decision, stating, "[T]he Court severely narrowed the scope of the *Runyon* ruling in deciding that: Racial harassment relating to conditions of employment is *not* actionable under Section 1981." It further stated that the bill restored to Massachusetts "the former protection of Section 1981 under the *Runyon* decision . . . . Without this new law, none of the[] victims of discrimination would be eligible for redress against *on-the-job discrimination*" (emphasis added).

In addition, in a letter to then Governor Michael Dukakis, dated the day before the bill passed the Senate, Senator Olver explained that MERA "would effectively reinstate the *employment discrimination* protection of the 1976 Supreme Court *Runyon* ruling that was partially overturned by the Court [by *Patterson* which] effectively took away from women and minorities the ability to sue for . . . *on-the-job discrimination*. If left unanswered, this ruling would remove an essential protection . . . from *employment discrimination*" (emphasis added). According to a news release dated the day Governor Dukakis signed into law what became G. L. c. 93, § 102, the Governor stated that the bill "effectively gives back *job discrimination protections* that the U.S. Supreme Court recently took away." The news release further stated that the legislation "reinstates the *employment discrimination protection* [of *Runyon*] which was partially overturned in June [by *Patterson* and] restores to workers the ability to sue for money damages in cases of *on-the-job discrimination*" (emphasis added). The news release quoted Attorney General Shannon: "In the [C]ommonwealth, people not only have a right to be free from harassment and abuse, they have a basic right to achieve and not be denied a chance simply because of their race, religion or gender." Finally, a press release from Senator Olver's office reiterated that the new law would overturn *Patterson*'s decision to deny recovery to victims of on-the-job discrimination.

2. Recognizing that our conclusion that the plaintiff in this case may assert a claim under MERA is supported by this history, we now address whether the phrase "make and enforce contracts" in § 102 is limited, as the judge concluded, to the hiring phase of employment, as set forth by the United States Supreme

being considered. See Johnson, *supra* at 18-19.

Court in *Patterson.* The defendant argues that the judge's conclusion was correct because, although Congress amended § 1981 in 1991 to make it clear that "enforce" contracts covered the course of employment, see note 4, *supra,* our Legislature did not amend MERA correspondingly. We disagree.

The question before this court is what our Legislature meant by the phrase "make and enforce contracts." "While interpretations of a Federal statute which is similar to the State statute under consideration are often helpful . . . , such interpretations are not binding on a State court construing its own State statute." *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 167 (1978) (concluding that pregnancy discrimination was a form of sex discrimination), citing *General Elec. Co.* v. *Gilbert,* 429 U.S. 125, 149 (1976) (Brennan, J., dissenting). Moreover, as discussed, because MERA is a civil rights statute, we are required to construe its terms broadly.

In *Patterson, supra* at 177, the Court stated that, in § 1981, the word "enforce" simply meant that it prohibited efforts to prevent someone from gaining access to a legal process to address and resolve a contract claim, whether through the courts or other dispute resolving adjudication. See *id.* (phrase "enforce contracts" "prohibits discrimination that infects the legal process . . . and covers wholly private efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes"). To follow this interpretation of the word "enforce" would require us to contravene the Legislature's directive that, when interpreting statutes, "[w]ords and phrases shall be construed according to the common and approved usage of the language . . . ." G. L. c. 4, § 6, Third. According to Black's Law Dictionary 569 (8th ed. 2004), "enforce" means to "give force or effect to." Accord Webster's Third New International Dictionary 751 (1993) ("enforce" means "to give force to . . . to put in force . . . cause to take effect . . . give effect to"). Thus the common meaning of "enforce a contract" would cover discriminatory treatment during the course of employment. See generally *Harvard Law Sch. Coalition for Civ. Rights* v. *President & Fellows of Harvard College,* 413 Mass. 66, 70 (1992) (law students had no standing to sue over school's failure to hire minority faculty in violation of § 102 of MERA, where students did not "allege that the . . . school

discriminate[d] against them . . . in providing contractual benefits"). Indeed, in MERA, the phrase "to make and enforce contracts" is set apart from the other enumerated rights by commas, and a list of property rights comes before the statute enumerates the rights to "sue, be parties, [and] give evidence," suggesting that "enforce" cannot just mean the right to legal process. Such an interpretation would seem to render the enumerated right to "sue" superfluous.[26] *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 352 Mass. 617, 618 (1967), quoting *Bolster* v. *Commissioner of Corps. & Taxation*, 319 Mass. 81, 84-85 (1946) ("None of the words of a statute is to be regarded as superfluous").

"When the use of the ordinary meaning of a term yields a workable result, there is no need to resort to extrinsic aids, such as legislative history." *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701, 704 (1984), citing *Hashimi* v. *Kalil*, 388 Mass. 607, 610 (1983). Such is the case here. However, we note that, as discussed, because *Patterson* was decided after the MERA bill passed the House but before the Senate vote, the question arose whether to amend the bill. That was decided to be unnecessary in light of this court's other decisions concerning civil rights statutes. Johnson, *supra* at 18-19. Moreover, to follow *Patterson*'s interpretation in light of the statements by Senator Olver, the bill's sponsor in the Senate, and by Governor Dukakis that the bill covered on-the-job discrimination would be to endorse "the narrowest possible scope, selecting the most pinched reading," of a statute that was enacted specifically to counter the feared effects *Patterson* would have on the civil rights of the citizens of the Commonwealth. *Patterson, supra* at 189 (Brennan, J., dissenting). Indeed, *Patterson* departed from Supreme Court precedent, in offering so narrow an interpretation of § 1981. *Id.* at 189-191, 196 (Brennan, J., dissenting). See note 4, *supra*. For all these reasons, we conclude that the Legislature intended the phrase "enforce

[26]We also note that the narrow interpretation of the phrase "enforce contracts" seemingly would require us to interpret the directive of § 103 of MERA, that all the rights under § 102 be conferred with a reasonable accommodation for those with a handicap or over the age of forty, to mean that MERA could only be used to file a claim where a prospective employer refused to make a contract that included the *promise* of a reasonable accommodation.

contracts" to cover discrimination in the course of employment.[27]

*Conclusion.* We conclude that where an employee is not able to bring a complaint for employment discrimination under G. L. c. 151B, because the employer has fewer than six employees, a plaintiff may bring a claim in the Superior Court under MERA. Accordingly, we vacate the order and judgment dismissing the complaint and remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

BOTSFORD, J. (concurring, with whom Marshall, C.J., and Greaney, J., join). I agree with the result reached by the court, the remedy ordered, and much of the reasoning in the court's opinion. I add these additional thoughts regarding the relationship between two statutes at issue in this case, G. L. c. 151B, § 9, and G. L. c. 93, § 102 (*a*), and their proper interpretation under governing principles of statutory construction. I also address briefly the policy arguments that have been raised.

1. *General Laws c. 151B, § 9, and G. L. c. 93, § 102* (a). The defendant argues that the plaintiff cannot pursue her claim of employment discrimination based on sex[1] against the defendant under G. L. c. 93, § 102 (*a*) (§ 102 [*a*]), because G. L. c. 151B (c. 151B) represents the exclusive avenue available for a claim of employment discrimination under Massachusetts law. Under the defendant's theory, the Legislature's limiting the coverage of c. 151B to employers with six or more employees signaled a clear and continuing policy choice to exempt smaller employers

---

[27]The dissent states, *post* at 471 (Cordy, J., dissenting), that we make no mention of fifteen years of thoughtful decisions made by judges in the Superior Court, who have dealt with the meaning of the phrase "make and enforce contracts" and who have come to a contrary conclusion. The analyses of the judges were raised by the defendant and are addressed in this opinion. More importantly, Superior Court opinions have no precedential value. *Ciampi* v. *Commissioner of Correction, ante* 162, 169 n.11 (2008).

[1]The defendant appears to agree that a classification which relies on pregnancy as the determinative criterion for discharge is a distinction based on "sex" within the meaning of the statute. See, e.g., *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 168-169 (1978).

from any and all employment discrimination claims by their employees. Like the court, I disagree.

As the court points out, plain and unambiguous statutory language usually is conclusive of legislative intent. *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986), and cases cited. Section 102 (*a*) explicitly states, in pertinent part, that *"[a]ll* persons" shall have a right to "make and enforce contracts" without regard to sex (emphasis supplied).[2]

Moreover, c. 151B itself reflects a determination by the Legislature that an antidiscrimination statute such as § 102 (*a*) should be applied as written. Chapter 151B, § 9, as amended through St. 2002, c. 223, § 2 (§ 9), provides in its first paragraph:

> "This chapter shall be construed liberally for the accomplishment of its purposes, *and any law inconsistent with any provision of this chapter shall not apply, but nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination*; but, as to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned" (emphasis supplied).

The quoted antirepeal language in § 9, "but nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination,"

---

[2] The argument has been raised in this case that G. L. c. 93, § 102 (*a*) (§ 102 [*a*]), itself contains language dictating that the section cannot be applied to a claim of employment discrimination against an employer with fewer than six employees. In particular, the contention is made that the excepting clause in § 102 (*a*) — "[a]ll persons . . . regardless of sex, race, color, creed or national origin, shall have, *except as is otherwise provided or permitted by law*, the same rights enjoyed by white male citizens, to make and enforce contracts" — incorporates into § 102 (*a*) the statutory exemption of smaller employers from c. 151B, § 1 (5), and means that the conduct of such employers cannot qualify as unlawful discrimination (emphasis supplied). The argument fails. The exclusion of smaller employers from the definition of "employer" in c. 151B simply means that they are not subject to that particular statute. The exclusion clearly does not itself "provide" authorization for or "permit" such employers to discriminate against their employees on the basis of sex or any other category listed in § 102 (*a*).

was added to § 9 in 2002, and thus well after the 1989 enactment of § 102 (*a*) and MERA generally. St. 2002, c. 223, § 2. Prior to this 2002 amendment, insofar as discrimination based on sex is concerned, § 9 referenced only one statute that was deemed not repealed by any provision in c. 151B. See G. L. c. 151B, § 9, first par., as amended through St. 1991, c. 323, §§ 3, 4.[3]

We assume that in amending § 9 in 2002, the Legislature's use of comprehensive antirepeal language to refer to existing statutes "relating to discrimination" was intended to emphasize that c. 151B displaced none of them, including § 102 (*a*). See *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554 (1996) (court assumes Legislature aware of existing statutes when it enacts subsequent ones). It is also the case that we are bound, if possible, to interpret § 9 "in harmony with prior enactments to give rise to a consistent body of law," and we accept that "[t]he Legislature is ' "presumed to understand and intend all consequences" of its acts.' " *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 583 (1994), quoting *Hadley* v. *Amherst*, 372 Mass. 46, 51 (1977), and *Boston Water & Sewer Comm'n* v. *Metropolitan Dist. Comm'n*, 408 Mass. 572, 578 (1990). Following these interpretive precepts, we are obliged to read the first paragraph of § 9, with the broad antirepeal language added by the 2002 amendment, to reflect a legislative intent that in any instance where an antidiscrimination statute other than c. 151B applies, it may be enforced, so long as it is not inconsistent with any provisions of c. 151B and does not interfere with the exclusivity of a pending administrative proceeding under c. 151B, § 5.

Section 102 (*a*) meets both of these conditions. Because c. 151B applies only to employers with six or more employees, it has no bearing on claims brought under a separate statute, such as § 102 (*a*), by employees who work for employers with five or fewer employees; the two statutes simply have, to some extent, different points of focus. Moreover, and again because

---

[3]The single statute relating to women that was specified in c. 151B, § 9, first par., before 2002 was G. L. c. 149. In particular, § 9 provided in pertinent part: "[N]othing contained in this chapter shall be deemed to repeal *any provision of [c. 149] which establishes standards, terms or conditions of employment which are applicable to females*" (emphasis supplied). G. L. c. 151B, § 9, as amended through St. 1965, c. 397, § 7.

c. 151B does not apply, an administrative proceeding involving a claim against a smaller employer could never be pending under c. 151B, § 5. Accordingly, c. 151B does not preclude an employee such as the plaintiff, who alleges pregnancy-based sex discrimination against an employer with fewer than six employees, from pursuing her claim under § 102 (*a*).[4]

2. *Meaning of "to make and enforce contracts" in § 102 (*a*).* The defendant also argues that even if c. 151B does not bar the plaintiff from bringing her employment discrimination claim under § 102 (*a*), that section is nonetheless inapplicable as it pertains, in the employment context, only to the right to enter into an employment contract (to "make" contracts) or the right of access to legal process to enforce employment contract rights (to "enforce" contracts). The defendant contends that § 102 (*a*) provides no remedy for the plaintiff's claim, which challenges conduct of the employer after the employment relationship had been formed (so-called "on-the-job" discrimination).

The defendant's argument is premised on the fact that § 102 (*a*) was modeled after 42 U.S.C. § 1981 (§ 1981), as in effect in 1988 and 1989. One month before § 102 (*a*) was enacted in 1989, the United States Supreme Court interpreted the phrase "to make and enforce contracts" appearing in § 1981 to cover only

---

[4]This court has long held that in employment discrimination cases where c. 151B applies, that chapter provides the exclusive route that a plaintiff employee must follow in the first instance in order to bring a discrimination claim against her employer; she cannot bypass the administrative procedures and the deadlines set out in c. 151B by simply bringing a claim in the Superior Court under another discrimination statute, including § 102 (*a*). See *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 582-584, 585-586 (1994), and cases cited. See also *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554 (1996). We have also held, however, that where c. 151B does not apply to certain employment discrimination claims because the plaintiff's employer has fewer than six employees, the plaintiff may pursue other available statutory remedies through a suit brought directly in court. See *Guzman* v. *Lowinger*, 422 Mass. 570, 572 (1996). See also *O'Connell* v. *Chasdi*, 400 Mass. 686, 693-694 (1987). The result reached today is consistent with these cases. Nothing in the court's opinion suggests that we are changing the rule that where c. 151B applies, the exclusivity provisions of c. 151B, § 9, mandate that a plaintiff first file her discrimination claim with the MCAD in accordance with the requirements of that chapter. However, where, as here, c. 151B has no application, the plaintiff may file her claim of discrimination under another antidiscrimination statute, including § 102 (*a*), directly in court, if she otherwise meets any requirements that such other statute may impose.

claims involving discrimination in the formation of a contract or claims about discriminatory conduct that prevented a person from using a fair legal process to enforce contract rights. *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 176-178 (1989) (*Patterson*). In the defendant's view, because the Massachusetts Legislature made no changes to the language of the pending bill that was passed and enacted as § 102 (*a*) soon after *Patterson* was decided, the Supreme Court's interpretation of § 1981 in that case should govern our interpretation of the cognate phrase in § 102 (*a*). I agree with the court that the defendant's argument must be rejected.

"In construing Massachusetts statutes we are ordinarily guided by the construction given the parallel Federal statute by the Federal courts." *Howard* v. *Burlington*, 399 Mass. 585, 589 (1987). However, Federal statutes and the Federal courts' interpretations of them "are not determinative . . . [where] the issue presented is purely one of the interpretation of a Massachusetts statute. . . . While interpretations of a Federal statute which is similar to the State statute under consideration are often helpful in setting forth all the various policy considerations, such interpretations are not binding on a State court construing its own State statute." (Citations omitted.) *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 167 (1978) (interpreting c. 151B, § 4, more expansively than the United States Supreme Court had interpreted similar language in § 703[a][1] of Title VII, 42 U.S.C. § 2000e-2[a][1]).

We have not before been called on to interpret the phrase "to make and enforce contracts" appearing in § 102 (*a*).[5] The statute does not define these words. The court notes that as a matter of Massachusetts law, the Legislature directs that, when interpreting statutes, "[w]ords and phrases shall be construed according to the common and approved usage of the language . . . ." G. L. c. 4, § 6, Third. According to Black's Law Dictionary (8th ed. 2004), "make" means to "cause (something) to exist," *id.* at 975, while "enforce" means to "give force or effect to." *Id.* at 569. The common meaning of these words, and particularly the word "enforce," therefore, appears to cover claims of discriminatory treatment during the course of employment: a person

---

[5]The same phrase appears as well in the other section of MERA, G. L. c. 93, § 103, but we have also not interpreted it in that context.

making such a claim is seeking to give effect to her right to a contract of employment that is made, and carried out, in a manner free of discriminatory terms and conditions.

It is worth noting that before the United States Supreme Court's decision in *Patterson*, Federal courts, including the Supreme Court, assumed (sometimes without discussion) that the phrase "to make and enforce contracts" in § 1981 covered a wide variety of claims about discriminatory terms and conditions of employment and postcontract-formation conduct generally. See, e.g., *Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454, 455, 459-461 (1975); *Choudhury* v. *Polytechnic Inst. of N.Y.*, 735 F.2d 38, 42-43 (2d Cir. 1984); *Winston* v. *Lear-Siegler, Inc.*, 558 F.2d 1266, 1268 (6th Cir. 1977); *Caldwell* v. *National Brewing Co.*, 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916 (1972); *Young* v. *International Tel. & Tel. Co.*, 438 F.2d 757, 759-760 (3d Cir. 1971). See also *CBOCS West, Inc.* v. *Humphries*, 128 S. Ct. 1951, 1956 (2008) (noting that before *Patterson*, Federal courts interpreted § 1981 "make and enforce contracts" language to reach postemployment retaliation claims); *Patterson*, 491 U.S. at 220 (Stevens, J., concurring in part and dissenting in part) (meaning previously given by Court to phrase "right . . . to make and enforce contracts" encompasses employee's right to protection from on-the-job racial harassment by her employer). Moreover, in his separate opinion in *Patterson*, Justice Brennan described the legislative history of the Civil Rights Act of 1866, on which § 1981 was based in significant part; in his view, the history showed that in enacting the Civil Rights Act of 1866, Congress was focusing on discriminatory terms and conditions of employment as well as refusals to contract. *Patterson*, 491 U.S. at 206 (Brennan, J., concurring in part and dissenting in part). See *id.* at 207 (Brennan, J., concurring in part and dissenting in part) ("the language of § 1981 is quite naturally read as extending to cover postformation conduct that demonstrates that the contract was not really made on equal terms at all"); *id.* at 221-222 (Stevens, J., concurring in part and dissenting in part) (postformation discriminatory treatment of employees represents discrimination in "making" of contract).

Additional support for this construction of "make and enforce contracts" comes from the legislative history of § 102 (*a*), which

suggests that the Legislature did not intend to confine this phrase to the narrow meaning that the United States Supreme Court gave these words in *Patterson*. The court has recounted this history at length, *ante* at 449-452, and I need not repeat it. I simply emphasize that in a letter to the then Governor dated July 18, 1989 — and therefore *after* the Supreme Court had issued its decision in *Patterson* — then Senator John Olver, the Senate sponsor of the bill that ultimately was enacted as § 102 (*a*), reflected an awareness of and intent not to follow the Supreme Court's *Patterson* decision. In particular, Senator Olver stated that the proposed legislation would afford Massachusetts citizens broader protection against employment discrimination than was now available under § 1981, as construed by *Patterson*, including on-the-job discrimination.[6] And when the Governor signed the legislation on August 3, 1989, with an emergency preamble (St. 1989, c. 332), he issued a news release that demonstrates the same awareness of *Patterson* and the same understanding that the Massachusetts legislation was designed to change the *Patterson* result.[7]

This legislative history is informal,[8] but I share the court's view that it reflects a purpose on the Legislature's part to give the phrase "to make and enforce contracts" in § 102 (*a*) its ordinary meaning rather than to adopt the confined reading of the *Patterson* decision.[9]

---

[6]Senator Olver's letter stated in part: "House Bill 4654, 'An Act Relative to Equal rights Under the Law,' is a major piece of civil rights legislation that was passed by the House on May 24. It would effectively reinstate the employment discrimination protection of the 1976 Supreme Court *Runyon* ruling that was partially overturned by the Court on June 15 in the case of *Patterson* v. *McLean Credit Union*[, 491 U.S. 164 (1989)] . . . . In that decision, the Court effectively took away from women and minorities the ability to sue for punitive damages under [42 U.S.C.] Section 1981 of the U.S. Code for on-the-job discrimination."

[7]Thus, the news release stated, "The legislation . . . reinstates the employment discrimination protection of the 1976 Supreme Court *Runyon* v. *McCrary*[, 427 U.S. 160 (1976),] ruling which was partially overturned in June by *Patterson* v. *McLean Credit Union*. This restores to workers the ability to sue for money damages in cases of on-the-job discrimination. . . . [I]t expands protection for minorities and women against harassment at work and bans all discrimination based on sex, race, color, creed or national origin."

[8]The cases cited by the court, *ante* at note 19, make the point that informal history can be useful.

[9]Two years after *Patterson* was decided, Congress replaced the phrase

3. *Policy concerns.* The defendant and some amici contend that it is both unreasonable and anomalous to interpret § 102 (*a*) to permit employment discrimination claims against small employers who are exempt from suit under c. 151B. They point, for example, to the different statutes of limitations, standards of proof, and available damages, to suggest that it would be "incongruous" to make it easier to bring and prevail on employment claims against small employers rather than those who employ six or more employees. On the other hand, the plaintiff and other amici have presented information showing that as of 2007, over fifty-eight per cent of businesses in the Commonwealth have five or fewer employees. *Ante* at 448. Concluding that such employers are exempt from any statutory workplace nondiscrimination provisions would leave sizable numbers of employees with no legal recourse against discriminatory conduct.[10]

These arguments point to different and competing policy concerns that the court is not in a position to resolve. The result the court reaches in this case is mandated by well-established principles of statutory construction.

CORDY, J. (dissenting, with whom Cowin, J., joins). The court in this case holds that the Massachusetts Equal Rights Act (MERA), G. L. c. 93, § 102, silently and implicitly repealed the

"make and enforce contracts" with the phrase "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b), as amended by Pub. L. 102-166, 105 Stat. 1071. The defendant argues that the Massachusetts Legislature's failure similarly to modify the language of § 102 (*a*) evidences a legislative determination to be bound by the interpretation the United States Supreme Court gave to "make and enforce contracts" in *Patterson.* I disagree. No amendment to § 102 (*a*) was warranted because, as indicated in the text above, the existing "make and enforce" language in that section already encompassed claims regarding the terms and conditions of employment.

[10]Employees of smaller employers who allege racial discrimination of course may bring direct actions under 42 U.S.C. § 1981 (§ 1981) against their employers, and may assert in such actions all manner of claims concerning the terms and conditions of employment or on-the-job discrimination; this right exists completely independently of either Title VII or c. 151B. See *CBOCS West, Inc.* v. *Humphries,* 128 S. Ct. 1951, 1960 (2008), and cases cited (discussing "necessary overlap" between Title VII and § 1981). However, § 1981 does not cover other types of discrimination.

express exemption in G. L. c. 151B, § 1 (5), of employers with fewer than six employees, from employment discrimination claims. Because I conclude that the statutory text, legislative history, and our cases do not support the court's conclusion, I respectfully dissent.

*General Laws c. 151B.* An act making it unlawful to discriminate in employment practices on the basis of race, color, religious creed, national origin, or ancestry was passed by the Legislature in 1946, and was enacted into law as c. 151B of the General Laws (c. 151B). Its enactment was the culmination of years of hearings and investigations undertaken by the legislative and executive branches,[1] during the course of which hundreds of persons representing a broad array of religious societies, civic organizations, labor unions, employer groups, and societies for the advancement of minority races and nationalities testified in favor of legislation to eliminate discrimination in the workplace. Chapter 151B established the Massachusetts Fair Employment Practice Commission (the predecessor to the Massachusetts Commission Against Discrimination), made it unlawful for employers to engage in discriminatory practices, and created a comprehensive statutory scheme under which employees could vindicate their rights and obtain remedies against employers who engaged in such practices. "[A]fter careful consideration," the Governor and the Legislature determined to "exempt" from the law those employers "who employ less than six persons for reasons of practical administration and to exempt more or less personal relationship[s], small business[es] and family farms."[2] 1946 House Doc. No. 400, at 12 n.1.

Since 1946, the Legislature has amended c. 151B, § 1, on dozens of occasions.[3] Many of those amendments have either extended the reach of the law by, for example, barring discrimina-

---

[1] A special commission had reported its findings regarding the existence of discrimination in employment to the Legislature on December 21, 1944, as directed by Res. 1943, c. 39. 1946 House Doc. No. 400, at 3. Thereafter, the Governor appointed a committee to recommend remedial legislation. *Id.* at 2.

[2] General Laws c. 151B, as enacted in 1946, also exempted "a club exclusively social, or a fraternal, charitable, educational or religious association or corporation, if such club, association or corporation is not organized for private profit." St. 1946, c. 368, § 4.

[3] The definition section (§ 1) of c. 151B, which includes the definition of

tion on the basis of sex or sexual orientation, or have broadened the range of practices defined as unlawful. Some have narrowed the categories of organizations exempted from the law.[4] The Legislature, however, has never altered the fine balance it struck in 1946, between the goal of eliminating discrimination in employment and the recognition of the burden that such a goal would place on the smallest of our businesses, often family businesses, that depend on the personal working relationships of their five or fewer employees.

*The Massachusetts Equal Rights Act.* MERA was enacted in 1989. It provides, in pertinent part:

> "All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property . . . ." G. L. c. 93, § 102 (*a*).

Its genesis is undisputed. It is modeled after 42 U.S.C. § 1981 (§ 1981), an act passed by Congress in the aftermath of the Civil War to ensure that Americans of all races were afforded the same rights as white Americans in a wide array of activities thought necessary to their full participation in civil society.

MERA was drafted and proposed in reaction to fears that the United States Supreme Court, in the then pending case of *Patterson* v. *McLean Credit Union*, 491 U.S. 164 (1989), abrogated by the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071, might overrule a prior Court decision, *Runyon* v. *McCrary*, 427 U.S. 160 (1976), which had established that § 1981 applied to discriminatory actions in the private sector. The

---

"employer," has been amended nineteen times since 1946; § 4, which sets out the practices made "unlawful" by c. 151B, has been amended fifty-six times since 1946.

[4] For example, in 1969, the Legislature amended c. 151B to eliminate the exemption for charitable and educational associations or corporations that are not "operated, supervised or controlled by . . . a religious organization." See G. L. c. 151B, § 1 (5), as amended through St. 1969, c. 216.

intention of MERA's drafters and legislative sponsors was to pass a State statute that ensured that antidiscrimination laws would continue to apply both to private and government actors.[5]

MERA makes no specific mention of employment or employment discrimination, nor does it reference c. 151B.[6] There is no evidence in the history of MERA's enactment that it was intended to extend the reach of the State's employment discrimination laws, set out with great specificity in c. 151B, to small businesses by repealing or nullifying the exemption that had been carved out in 1946, or that there was a problem of discrimination in that sector of our employer community that required a rebalancing of the burdens and benefits that had been so carefully considered at that time.[7] The question before us is simply whether the Legislature intended such a result. I conclude that they did not.

First, the wording of MERA cautions against inferring such intent. In failing to mention employment or even reference the statutory scheme of the employment discrimination laws, the

[5]The Massachusetts Equal Rights Act (MERA) also extended the protections of § 1981 by expressly covering discrimination based on "sex, race, color, creed, [and] national origin," and by permitting a plaintiff to establish a violation of MERA "based on the totality of circumstances." G. L. c. 93, § 102 (*a*) and (*c*).

[6]General Laws c. 93, § 103, enacted one year after § 102, does refer to c. 151B's definitions of "handicap" and "age." Neither section, however, states that it applies in spite of c. 151B's small employer exemption. See G. L. c. 93, §§ 102, 103.

[7]The court in its opinion cites statistics from the United States Department of Labor Bureau of Labor Statistics and the United States Census Bureau, which show that over fifty-eight per cent of the businesses in the Commonwealth employed less than five (i.e., four or fewer) employees in 2005 and 2007. *Ante* at 448. The court states that "we cannot conclude that the Legislature meant to exempt a potential majority of the employers in the Commonwealth from its antidiscrimination laws." *Id.* What is not referenced in the opinion is that the percentage of the Massachusetts workforce employed by those small businesses was quite low: 7.22%, 6.96%, and 6.75% in January, February, and March, 2007, respectively. See United States Department of Labor, Bureau of Labor Statistics, 2007 Quarterly Census of Employment and Wages (preliminary data). See also United States Census Bureau, 2005 Statistics of United States Businesses (employees of businesses with fewer than five employees comprise 4.7% of the total private workforce in Massachusetts); United States Department of Labor, Bureau of Labor Statistics, 2005 Quarterly Census of Employment and Wages (employees of businesses with fewer than five employees comprise 6.74% of the total private workforce in Massachusetts).

effect of the statute with regard to the 1946 exemptions is, at a minimum, ambiguous.[8] Indeed, this case is before us because the Superior Court judge concluded that MERA did not alter these exemptions. When faced with such an ambiguity, we interpret a statute "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Legislative history and the language and construction of related statutes may assist us in ascertaining and effectuating the Legislature's intent. *Commonwealth* v. *Welch*, 444 Mass. 80, 85 (2005), and cases cited. We construe the words of one statute "in association with other statutory language and the general statutory plan." *Polaroid Corp.* v. *Commissioner of Revenue*, 393 Mass. 490, 497 (1984). See *Cote-Whitacre* v. *Department of Pub. Health*, 446 Mass. 350, 358-359 (2006) (Spina, J., concurring). "[W]here two or more statutes relate to the same subject matter, they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." *FMR Corp.* v. *Commissioner of Revenue*, 441 Mass. 810, 819 (2004), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975).

Beginning with the words themselves, MERA directly grants to all persons "the same rights enjoyed by white male citizens" with respect to making and enforcing, in this case, employment contracts. G. L. c. 93, § 102 (*a*). We should first ask, What "rights" do "white male citizens" have in this respect?[9] The

---

[8]In contrast, the effect of the maternity leave statute, G. L. c. 149, § 105D, on c. 151B is clear because § 105D expressly indicates that the term "employer" as used in that section "shall be defined as in" c. 151B, § 1 (5). Similarly, the effect of the sexual harassment statute, G. L. c. 214, § 1C, on c. 151B is clear because the Legislature amended c. 151B when it enacted c. 214, § 1C. St. 1986, c. 588. See *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 557 (1996) (holding employers with fewer than six employees subject to suit under c. 214, § 1C). See also *Guzman* v. *Lowinger*, 422 Mass. 570, 572 (1996) (same). The critical difference here is that the Legislature made no change or reference to c. 151B when it initially enacted MERA. Thus, unlike c. 214, § 1C, MERA should not be so readily construed as having created a cause of action for employees of small employers.

[9]MERA does not create new rights for white male citizens.

answer seems apparent. Chapter 151B, the Massachusetts em-
ployment discrimination act, has been in place since 1946.[10] It
gives white males (and all others) the right not to be discrimi-
nated against by employers of six or more persons based on their
race, gender, religious creed, national origin, or sexual orientation.
To the extent that the rights of "white male citizens" are defined
in and limited in the employment context by c. 151B, the plain
language of the statute suggests that the rights guaranteed to
"[a]ll persons" under MERA are similarly defined and constrained.

Alternatively, this interpretation is consistent with the built-in
limitation on the reach of MERA, that is, that all persons shall
have such rights "except as is otherwise provided or permitted
by law." This phrase, while not definitive, plainly suggests that
it was not the intention of the Legislature to upset other specific
provisions of law already governing the rights of persons in the
various contexts in which MERA might apply, such as the exemp-
tions of small employers, and other social, fraternal, and religious
organizations set forth in c. 151B.[11] Chapter 151B, which also
prohibits discrimination in the leasing of residential properties,
contains a similar exemption for the owner occupants of two-
family dwellings. G. L. c. 151B, § 4 (7) and (11) (3). While
there is no suggestion that the Legislature intended MERA to
upset this exemption either, the court's analysis would compel
that result as well.

This court's well-settled principles of statutory construction
lead to the same conclusion. When we construe a statute, we "as-
sume . . . that the Legislature was aware of [any] existing stat-

---

[10]In contrast to Massachusetts, when 42 U.S.C. § 1981 was enacted by
Congress in the Nineteenth Century, there was no comprehensive Federal
employment discrimination law enumerating the rights of employees to be
free from certain discriminatory employment practices.

[11]Stephen P. Johnson, legislative counsel for the Boston Bar Association in
1989 and one of MERA's drafters, has indicated that MERA can be read to
incorporate c. 151B's exemptions through its "except as is otherwise provided
or permitted by law" provision. See Johnson, The 1989 Massachusetts "Equal
Rights Law": A Short History, 34 B.B.J. 17, 19 (1990) (MERA's exception
could "be found, e.g., to exclude religious institutions from the definition of
'employer' " in G. L. c. 151B, § 1 [5]). See also Heins, Massachusetts Civil
Rights Law, 76 Mass. L. Rev. 77, 86 (1991) ("the ambiguous language of
G.L.M. c. 93, § 102 [*a*] ['except as is otherwise provided or permitted by
law'] . . . could be interpreted to extend the 151B exemptions for small
employers and landlords to [MERA]").

utes," *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 582 (1994), quoting *Mathewson* v. *Contributory Retirement Appeal Bd.*, 335 Mass. 610, 614 (1957), and "if possible a statute is to be interpreted in harmony with prior enactments to give rise to a consistent body of law." *Charland* v. *Muzi Motors, Inc.*, *supra* at 583. Moreover, this court "will find an implied repeal of one statute by another only when 'the prior statute is so repugnant to, and inconsistent with, the later enactment that both cannot stand.' " *Boston* v. *Board of Educ.*, 392 Mass. 788, 792 (1984), quoting *Commonwealth* v. *Graham*, 388 Mass. 115, 125 (1983). In other words, a "statute is not to be deemed to repeal or supersede a prior statute in whole or in part in the absence of express words to that effect or of clear implication." *Commonwealth* v. *Hayes*, 372 Mass. 505, 512 (1977), quoting *Colt* v. *Fradkin*, 361 Mass. 447, 449-450 (1972). Therefore, "[w]here the repealing effect of a statute is doubtful, the statute is strictly construed to effectuate its *consistent* operation with previous legislation" (emphasis in original), *Commonwealth* v. *Hayes*, *supra*, quoting 1A C. Sands, Sutherland Statutory Construction § 23.10 (4th ed. 1972), because "[i]t is not to be lightly supposed that radical changes in the law were intended where not plainly expressed." *Commonwealth* v. *Burke*, 390 Mass. 480, 486 (1983), quoting *Ferullo's Case*, 331 Mass. 635, 637 (1954). See *School Comm. of Newton* v. *Newton Sch. Custodians Ass'n, Local 454*, 438 Mass. 739, 751 (2003) ("In the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other"). Finally, "general statutory language must yield to that which is more specific." *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 18 (2000), quoting *Risk Mgt. Found. of Harvard Med. Insts., Inc.* v. *Commissioner of Ins.*, 407 Mass. 498, 505 (1990).

These established canons of statutory construction teach that to the extent MERA and c. 151B both address employment discrimination, they must be read together harmoniously. These two statutes are not so inconsistent that one must fail. Indeed, they are easily harmonized in the employment discrimination context by reading MERA as applying only to employers with six or more employees. To do otherwise is to read MERA as a silent

and implied repeal of c. 151B's carefully crafted exemption of small employers.[12]

Additionally, MERA's general language should be interpreted to yield to that of the far more specific c. 151B. MERA is a general statute aimed at providing a remedy for equal rights violations of many varieties. See G. L. c. 93, §§ 102, 103. As noted, nowhere does the statute mention employment discrimination or use the word "employer." See *id.* Chapter 151B, on the other hand, is a comprehensive antidiscrimination statute that specifically addresses employment discrimination of all types, see G. L. c. 151B, § 4 (1), (1A), (1B), (1C), (1D), (3), (4), (5), (9), (9A), (11A), (16), (16A), (17), (18), and (19), and specifically defines the term "employer" to exclude, among other things, "any employer with fewer than six persons in his employ." G. L. c. 151B, § 1 (5). Consistent with this court's interpretation of other statutes, the "general statutory language [of MERA] must yield to that which is more specific" in c. 151B. *TBI, Inc.* v. *Board of Health of N. Andover, supra.* Accordingly, the appropriate way to harmonize MERA with c. 151B is to read MERA to apply only to employers with six or more employees.

Finally, the court's reliance on c. 151B, § 9, first par., which provides that "nothing contained in this chapter shall be deemed to *repeal* any provision of any other law of this commonwealth relating to discrimination," is not persuasive (emphasis added). The court suggests that interpreting MERA so as to exempt small employers from its purview is to "repeal" MERA, at least in part. *Ante* at 445, 447-448. This understanding of § 9 misconstrues

---

[12]Not only would such an implied repeal subject small employers to employment discrimination suits filed directly in the Superior Court (without the benefit of Massachusetts Commission Against Discrimination's administrative procedures), it would also subject them to a longer statute of limitations and would lower the burden of proof for claimants. Compare G. L. c. 93, §§ 102 (*b*) and 103 (*b*) (permitting suit directly in the Superior Court), G. L. c. 260, § 5B (three-year statute of limitations for civil rights actions), and G. L. c. 93, §§ 102 (*c*) and 103 (*c*) ("totality of circumstances" test), with G. L. c. 151B, § 5, first par. (claimant alleging employment discrimination must file complaint with MCAD), *id.* at § 5, second par. (300-day statute of limitations), and *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 505-507 (2001) (to prevail under c. 151B, § 4, claimant must prove that discrimination caused adverse employment decision). This result is anomalous.

what it is to "repeal" a statute. Black's Law Dictionary defines "repeal" as the "abrogation of an existing law by legislative act." Black's Law Dictionary 1325 (8th ed. 2004). Accord Webster's Third New Int'l Dictionary 1924 (1993) ("repeal" means "to rescind or revoke [as a sentence or law] from operation or effect"). To read MERA as exempting small employers is not to repeal it, but to construe or interpret it in light of c. 151B. On the other hand, under the court's view, MERA does effectively repeal c. 151B's small employer exemption by allowing a complete "end run" around it.

More importantly, § 9 provides that "any law inconsistent with any provision of this chapter shall not apply." The court maintains that "there is nothing 'inconsistent' between" MERA and c. 151B "because they do not cover the same employers and provide different remedies." *Ante* at 445. While it is true that the statutes provide different remedies, it is also true that both statutes cover the *same* employers — namely, employers with six or more employees. To the extent that the court reads MERA to cover employers with fewer than six employees, MERA is plainly inconsistent with c. 151B's express exemption of small employers from employment discrimination claims. Accordingly, § 9 mandates that MERA "shall not apply" to small employers.

*The enforcement of contracts.* The second issue in this case is whether the "enforce contracts" phrase of MERA includes the right to be free from discriminatory acts committed after there is an employment contract in place. Just prior to the final enactment of MERA (which takes this language directly from § 1981), the United States Supreme Court interpreted "enforce contracts" to mean only the right to bring an action for breach of the employment contract, not a separate right to be free from on-the-job discrimination. *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 171 (1989). Notwithstanding the Supreme Court's interpretation of this identical language, the Legislature enacted and the Governor signed MERA.

"In construing Massachusetts statutes we are ordinarily guided by the construction given the parallel Federal statute by the Federal courts." *Howard* v. *Burlington*, 399 Mass. 585, 589 (1987), and cases cited. However, ultimately the question remains

one of statutory intent — that is, did the Legislature intend (when it enacted MERA) those words to mean what the United States Supreme Court said they did. Cf. *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 167 (1978) (Federal interpretations of Federal statute not binding on State court interpreting analogous State statute). The Superior Court judge here concluded that it did. That conclusion is supported by the fact that the Congress amended § 1981 two years after the *Patterson* decision to define the phrase "make and enforce contracts" to ensure that § 1981 would apply to postformation conduct such as on-the-job employment discrimination. See 42 U.S.C. § 1981(b). Yet, the Massachusetts Legislature failed to follow suit, and the "enforce contracts" language has remained unchanged and undefined.

I agree that the question is a close one, and that both sides have made a credible claim regarding the Legislature's intent given the sequence of events at the time of the statute's enactment. Based on my view that MERA does not create rights against employers already exempted by Massachusetts law, we need not decide this question. However, in proceeding to decide that the phrase "enforce contracts" covers discrimination in the course of employment, the court rejects (without a mention) more than fifteen years of thoughtful decisions made by judges in the Superior Court who have regularly dealt with the question and concluded otherwise. While a comprehensive search for and review of such decisions would be difficult to undertake, the only decisions I have discovered that are consistent with this court's view were authored in 1993 and 1996 by the judge in this case, who has since conformed his view with what appears to be the prevailing if not a uniform view to the contrary. If the Legislature intended the words of the statute to mean what the court now claims, I would have expected that at some point during this long history of decisions it would have amended the statute to say so.

I respectfully dissent.